| | |
|---|---|
| RANDOLPH DUANE ROSS, | ) |
| | ) |
| Plaintiff, | ) |
| | )    No. 3:26-CV-13-TAV-JEM |
| v. | ) |
| | ) |
| GREG LAMBERT, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Order [Doc. 13] referring the matter by United States District Judge Thomas A. Varlan.

Now before the Court is Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction Against Defendant Greg Lambert [Doc. 2]. Defendant responded in opposition to the motion [Doc. 22], and Plaintiff filed a reply [Doc. 29]. Later, Defendant filed a supplemental brief [Doc. 33].

On April 29, 2026, and June 30, 2026, the parties appeared before the Court for a motion hearing. Attorneys Ryan P. McMillan, S. Jarrett Rabb, and Greg Coleman appeared on behalf of Plaintiff. Defendant Greg Lambert appeared pro se.

The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a).

For the reasons set forth below, the Court **RECOMMENDS** that the District Judge **DENY** the motion [**Doc. 2**].

## I.    BACKGROUND

Plaintiff commenced this action on January 9, 2026, by filing a Verified Complaint ("Complaint") [Doc. 1].[1] According to the allegations in the Complaint, Plaintiff is a former collegiate track and field champion, 2004 Olympian, and the current Head Coach and Director of Track & Field at the University of Tennessee" [Doc. 44 ¶ 1]. In August 2022, Plaintiff hired Defendant "to serve as the track and field Recruiting Coordinator—which was a non-coaching, administrative position" [*Id.* ¶ 20]. Plaintiff alleges that less than a year later, in May 2023, he "advised [Defendant] that he was being terminated from his position as Recruiting Coordinator at the University of Tennessee" [*Id.* ¶ 22]. He claims that he "gave [Defendant] the option of 'voluntarily resigning' from his position in lieu of being fired for cause[,]" which Defendant accepted [*Id.*].

Plaintiff contends that on May 30, 2024, Defendant sent the Office of General Counsel at the University of Tennessee ("University") a demand letter ("May 30 Letter"), "threatening to sue the University and [Plaintiff] for 'wrongful termination and discrimination' if he did not receive payment of $150,000 from the University" [*Id.* ¶ 24]. According to Plaintiff, "Defendant . . . made a series of patently false and inflammatory allegations against [Plaintiff] in the [May 30] Letter and warned that he would go to the media with his allegations if the University did not settle" [*Id.* ¶ 25]. Specifically, the Complaint asserts that "[Defendant] made . . . knowingly false and derogatory statements[,]" including:

> a.    "Past Misconduct: **Duane Ross has a documented history of questionable behavior. He received a two-year suspension from the U.S. Anti-Doping Agency for using performance-enhancing drugs, disqualifying all his results since November 2, 2001. His involvement in the**

---

[1]    On May 4, 2026, the Court sealed the Complaint because it contained a photograph of minors [Doc. 43]. Plaintiff filed a redacted Complaint on May 6, 2026 [Doc. 44].

> **BALCO steroid case further underscores his troubled past.**"

b.  "Family Issues: **His son, Randolph Ross Jr., has also been suspended for doping violations. Randolph Ross Jr.'s suspension through June 30, 2025, for whereabouts failures and tampering with an email raises questions about the environment and influence under Duane Ross's watch. _Where do you think he learned that from?_**"

c.  "Athlete Violations. **_Under His Watch: Under Duane Ross's leadership, North Carolina A&T faced multiple suspensions of top athletes for doping violations. Grace Nwokocha was suspended right before the World Championships for doping. Additionally, Ross used an athlete who was not cleared by the NCAA, resulting in the forfeiture of team titles and performances. These incidents, though they occurred before his tenure at Tennessee, are closely tied to him and paint a picture of ongoing integrity issues._**"

d.  "Mr. Ross is not representing your brand appropriately, nor did he follow your procedures or policies, and I'm sure you provided him with all the tools to succeed and comply with your standards. This lack of competence raises serious questions about his ability to lead a program as esteemed as the University of Tennessee. At this point, he has proven to be a liability rather than an asset to the University."

[*Id.* ¶ 26 (citation omitted)]. The University rejected Defendant's demand [*Id.* ¶ 28].

Plaintiff claims that "[o]n or about March 3, 2025, less than two weeks before [Plaintiff's] team began competing at the 2025 NCAA Indoor National Championships, Defendant Lambert, under the pseudonym 'G. Fury,' released two songs on Apple Music and Spotify—titled 'Vault Talk' and 'Recruiter to Parent'" [*Id.* ¶ 30]. "Both songs[,]" Plaintiff alleges, "contain defamatory lyrics impugning [Plaintiff's] character, including but not limited to allegations of drug use by [Plaintiff] and his athletes" [*Id.*]. Plaintiff states that Defendant also "published 'Vault Talk' and 'Recruiter to Parent' in a public Facebook group titled[,] The Real Deal Track & Field Group"

3

[*Id.* ¶ 33]. "In early-to-mid March 2025," Plaintiff avers that "Defendant Lambert a/k/a G. Fury released three additional songs on Apple Music and Spotify" [*Id.* ¶ 34]. He asserts that one of those songs, "Laws of Attraction," "targeted [Plaintiff] with false and disparaging allegations of scandal and fraud" [*Id.* ¶ 34]. And later, Defendant sent "Laws of Attraction" to Plaintiff via text message [*Id.* ¶ 35].

"On March 13, 2025, Plaintiff submits that "Defendant . . . a/k/a G. Fury published another nine-track album titled, 'To C.A.P' on Apple Music and Spotify" [*Id.* ¶ 36]. Plaintiff claims that "[a] majority of the songs on the album are directed at [Plaintiff] and most, if not all of these songs, contain untruthful, derogatory and offensive statements about [him]" [*Id.*]. For instance, Plaintiff states that Defendant: "(i) alleges that [Plaintiff] and his son—who is an Olympic gold medalist and famous track and field star in his own right—of using [performance enhancing drugs]; (ii) claims that [Plaintiff] runs a dirty program at Tennessee; and (iii) accuses [Plaintiff] of infidelity" [*Id.*]. According to Plaintiff, Defendant's "album caught the attention of various social media personalities, who published stories about [Defendant's] music on various mediums" [*Id.* ¶ 37].

"At or around this same time," Plaintiff represents that Defendant "began spreading rumors that [Plaintiff]—who is married with three children—had an affair with one of his female assistant coaches and fathered a daughter with that coach" [*Id.* ¶ 38]. He claims that Defendant, "in an intentional attempt to harass and embarrass [Plaintiff], posted on his Instagram and Facebook accounts multiple AI generated/doctored photographs of [Plaintiff's] three children along with the assistant coach's daughter . . . but digitally modified the girl's face to make it appear to be [Plaintiff's] face" [*Id.* ¶ 39]. Later, in June 2025, Plaintiff states that Defendant "released yet another song on Apple Music and Spotify titled 'S.L.A.P.,' which clearly and unmistakenly

insinuates that a paternity test is needed to determine if [Plaintiff] fathered the assistant coach's daughter" [*Id.* ¶ 40].

Plaintiff contends that Defendant "remained silent over the next several months until resurfacing on November 12, 2025, when he directly texted [Plaintiff] criticizing [his] recent signing of a new track and field recruit" [*Id.* ¶ 41]. But on December 5, 2025, Plaintiff states that Defendant "dramatically ramped up his malicious campaign of harassment and disparagement against [him]" [*Id.* ¶ 42]. According to Plaintiff, Defendant:

> (1) sent a defamatory and wildly inappropriate email to hundreds of individuals in the collegiate track and field community, including members of the University of Tennessee's athletic department as well as members of the athletic departments of various rival schools such as Vanderbilt University, the University of Florida, the University of South Carolina, the University of Alabama, and the University of Texas . . . The six-page email includes a bizarre fictional script ridiculing [Plaintiff] as well as links to over 50 songs (including each of the defamatory songs detailed above) recorded by [Defendant] and released on Apple Music and Spotify. An overwhelming majority of these songs target [Plaintiff] and are intended to defame, demean, and humiliate him[;]
>
> (2) posted a video on Instagram and Facebook of a fake newscast about the BALCO steroid doping scandal from the early 2000s (which [Defendant] has repeatedly tried to link to [Plaintiff]) and its purported connection to the University of Tennessee Track and Field program under [Plaintiff; and]
>
> (3) between December 12 and December 25, 2025, Defendant Lambert posted more than 20 videos on Instagram and Facebook attacking [Plaintiff's] character with blatantly false allegations of wrongdoing and/or creating highly offensive and demeaning fake videos using AI.

[*Id.* ¶¶ 43–46 (emphasis and footnote omitted)]. With respect to the AI generated videos, these include "video clips depicting [Plaintiff] . . . with Sean 'Diddy' Combs" [*Id.* ¶ 47 (footnote

5

omitted); *see also id.* ¶ 48 (depicting Plaintiff with Sean 'Diddy' Combs and Sherrone Moore)]. Plaintiff alleges that Defendant continued making videos targeting him [*see id.* ¶¶ 49–51], which included accusations "of infidelity and impregnating (and then firing) his former assistant coach at the University" [*id.* ¶ 51].

Plaintiff contends that "on January 6, 2026, a few days before Tennessee's initial track and field meet of the 2026 season, Defendant . . . sent [Plaintiff] a text message in which he boasts that his campaign of defamation and cyber-harassment likely prevented [Plaintiff] from signing the top high school track recruit in the country to Tennessee's 2026 recruiting class" [*Id.* ¶ 52]. Plaintiff states that Defendant included in the text message "audio copies of two newly published songs by [Defendant] a/k/a/ 'G. Fury'— titled '3-years-left' and 'kinda-nice'—both of which defame [Plaintiff] and various athletes in the Tennessee program" [*Id.*]. According to Plaintiff, "[His] reputation—both professionally and personally—has been greatly damaged as a result of Defendant['s] . . . improper and wrongful conduct[,] and that [Defendant's] defamatory and offensive social media posts, music, and videos have been disseminated throughout the track and field community in the United States" [*Id.* ¶ 54].

Plaintiff alleges defamation [*id.* ¶¶ 56–62] and false light invasion of privacy [*id.* ¶¶ 63–68].

On January 1, 2026, Plaintiff filed the Motion for Temporary Restraining Order and Preliminary Injunction Against Defendant Greg Lambert [Doc. 2]. Specifically, he requests that the Court enter a temporary restraining order and preliminary injunction enjoining Defendant from (1) contacting Plaintiff, (2) sending communications to various individuals, (3) publishing defamatory, disparaging, or offensive material that relate to Plaintiff or his family, and (4) making any public statements about certain topics [*Id.* at 3].

Plaintiff argues that "[b]ased upon the facts set forth in the Verified Complaint, it is entirely appropriate, and indeed necessary under the prevailing law, for the Court to intervene and enter an order granting a temporary restraining order and preliminary injunction" [Doc. 2-1 p. 2 (citations omitted)]. He contends that the relevant factors that the Court must consider weigh in favor of his request [*Id.* at 11–15]. Plaintiff also asserts that the Court should not require him to post bond [*Id.* at 15–16].

Defendant filed a response in opposition to the motion [Doc. 22]. He claims that Plaintiff has not shown that the Court has personal jurisdiction over this matter [*Id.* at 1–2]. In addition, Defendant asserts that venue is improper [*Id.* at 2]. To the extent the Court finds otherwise, Defendant submits that Plaintiff cannot demonstrate the requirements for obtaining an injunction [*Id.* at 3–4, 5–6]. He argues that Plaintiff's injunction would infringe on his First Amendment rights [*Id.* at 4]. Stating that "Plaintiff repeatedly references alleged harm to the University[,]" Defendant asserts that Plaintiff lacks standing to assert claims on its behalf [*Id.*].

On February 13, 2026, Plaintiff filed a Verified Statement [Doc. 26], which details the facts according to Plaintiff. In addition, Plaintiff filed a reply, arguing that "the Court has specific jurisdiction over [Defendant] because he intentionally directed his communications and social media posts to citizens of Tennessee and [Plaintiff's] defamation and false light invasion of privacy claims relate to injuries suffered as a result of [Defendant's] communications and social media posts" [Doc. 29 p. 3 (citations omitted)]. "Venue is likewise proper in this district," Plaintiff states, "given that many of [Defendant's] defamatory communications were sent to and received by individuals located in Knoxville, Tennessee, the online activities and social media[] posts were directed to individuals located in Knoxville, and [Defendant's] conduct caused harm to [Plaintiff] in Knoxville" [*Id.* (citation omitted)]. With respect to his request for an injunction, Plaintiff argues

that he will likely succeed on the merits and that he will suffer irreparable harm without injunctive relief [*Id.*]. Plaintiff denies that the requested injunction will impermissibly restrain Defendant's First Amendment rights to free speech [*Id.* at 7–8]. Defendant's remaining arguments, Plaintiff submits, are irrelevant or without legal support [*Id.* at 8].

Defendant filed a supplemental brief, arguing that the injunction Plaintiff seeks would "prohibit [him] . . . from releasing music, posting on social media, and making any public statements about this litigation or about Plaintiff's conduct as a publicly employed coach at a state university" [Doc. 33 p. 1]. "The requested relief[,]" Defendant states, "is a classic prior restraint on core protected speech and raises immediate and serious First Amendment concerns" [*Id.*]. According to Defendant, "Prior restraints are permissible only in the most extraordinary circumstances" [*Id.* at 2 (citation omitted)]. He contends that "[t]hose circumstances do not include an unproven defamation dispute between a former employee and a public figure coach" [*Id.*]. Defendant claims that his speech is artistic expression and satire on matters of public concern [*Id.* at 2–3]. He argues that Plaintiff cannot show that an injunction is warranted under the relevant factors [*Id.* at 4–7].

## II.    TESTIMONY[2]

On April 29, 2026, Plaintiff called Defendant to the stand, and on June 30, 2026, Plaintiff testified.

---

[2]    At the April 29 and June 30 hearings, the parties raised various evidentiary objections. But the undersigned noted at the hearing that the Federal Rules of Evidence generally do not apply to preliminary injunction hearings. *Saidak v. Schmidt*, 501 F. Supp. 3d 577, 590 n.22 (E.D. Tenn. 2020 ("The Federal Rules of Evidence do not apply at preliminary injunction hearings generally.") (citation omitted)).

### A. Defendant's Testimony

Defendant testified that he has been involved in track and field for twenty years. He started working for Plaintiff on August 8, 2022, as the recruiting coordinator. As part of his job duties, he evaluated recruits to determine if they were a good fit for Plaintiff's coaching style. He also performed administrative duties and planned recruiting visits.

Defendant identified Exhibit 1, a video clip of him participating in an interview with Big Gem [Exh. 1]. Defendant stated that he uses the name "G. Fury" online. The interview occurred on January 27, 2026, after Plaintiff filed his lawsuit. Defendant acknowledged that during that interview, Big Gem asked if it was true or false whether Defendant's specific intent was to harm Plaintiff mentally, spiritually, or physically, and Defendant answered, "True" [Exh. 1]. Defendant denied engaging in a spear campaign against Plaintiff following his departure from the University. Instead, he stated that he intended to harm Plaintiff spiritually, mentally, and physically in the context of promoting his music. He submitted that no reasonable listener would take this interview seriously because it is within the context of his music and a joke. Defendant testified that Big Gem has over 100,000 followers on YouTube, and therefore, there is a lot of opportunity for people to watch the interview.

Defendant testified that Exhibit 2 is a social media post he made that included a post by Cameron [Exh. 2]. He has not met Cameron. Defendant acknowledged that he wrote the social media post, which states:

> I gotta apologize…
> because apparently I been mentally
> torching people all year
>
> I got folks talking lawsuits
> folks talking fights
> folks blocking me
> folks reporting me

9

pages getting taken down
coaches not getting extensions
people getting fired
careers changing
bankruptcies getting filed
national meets going left
marriages under review
paternity tests getting scheduled

And somehow…
I'm the problem.

[*Id.* (ellipses in original and emojis omitted)]. Defendant stated that in this post, he was talking about various public figures that he references in his music. He asserted that it clearly was a joke and that he made the post before Plaintiff filed the lawsuit. Later, during the hearing, Defendant claimed this post "was directed to a bunch of people," not directly about Plaintiff and any paternity tests or his marriage, and related to events in Defendant's life.

Defendant testified that Exhibit 3 is an artificial intelligence ("AI") generated video of himself that he posted on social media [Exh. 3]. He used an application called "Sora" that altered his voice. It says, "Ross, let me be very clear with you. I'm getting my pound of flesh. Not out of anger. Not out of revenge. But because the universe requires balance. And you my friend, you owe" [*Id.*]. He acknowledged that he was talking about Plaintiff. Defendant testified that included in the post is a disclaimer that it was created by AI and that a reasonable viewer would not take it seriously [*See id.*]. Defendant stated that according to his algorithm, he gets more views when he uses content about his issues with Plaintiff. Although he wanted to start a rap beef with him, Defendant stated there was no harm or violence towards Plaintiff.

Defendant admitted that he sent a text message to Plaintiff about a recruit declining to attend the University. He texted, "Happy New Year. This may have caused Tate not to come. Can't catch them all. Three years left." Defendant stated that he released a song noting that Plaintiff had

10

three years left on his contract at the University. He explained that students attend school for four years, so they will not attend a school if a coach only has three years left on a contract. He also acknowledged that he sent Plaintiff a text message about women track athletes in order to troll him because he knew Plaintiff was struggling with recruiting. He also released a song about it.

Defendant testified that Exhibit 4 is a photograph, labeled "Fury's Revenge," of Plaintiff's children, his son, and Plaintiff's former assistant coach's child that Defendant posted on Instagram [Exh. 4]. He used the photograph to troll Plaintiff after the University filed a false copyright claim against him. Defendant assumed Plaintiff was involved in that copyright claim. He later testified that he did not intend to post the photograph to harm Plaintiff's reputation. With respect to Exhibit 5, Defendant stated that it is an AI-generated conversation about Defendant bringing Plaintiff's children "into the record" because "it's hip hop" and "there ain't rules for this" [Exh. 5]. Defendant noted that the video is labeled as AI.

Defendant testified that he wrote a song called S.L.A.P., which means, "Say Less Apply Pressure" [Exh. 6]. The lyrics state:

> Ross, you don't get many bars just this
> Did you hear that paternity dis
> I ain't saying [the child's] yours, but the bars hit me
> Now you and your Tempest checking timelines behind the scenes

[*Id.*]. Defendant stated that he was referring to Plaintiff in the song and that Tempest is Plaintiff's former assistant coach. Defendant noted this is word play and not a verified fact. He stated that this song is about nepotism and contains a promotional reference to another song. Defendant claimed that most of his music is rhetoric, rap lyrics are not affidavits, and everyone has a different interpretation. He knew that Plaintiff and Tempest Love ("Ms. Love") had a professional relationship for 12 to 14 years.

11

Defendant testified that Exhibit 7 is an AI-generated interview that he created [Exh. 7]. The voice on the interview states that the assistant coach was doing "a lot of services; a lot of head work type favors" [*Id.*]. Defendant stated it is a fake interview, labeled AI, and no reasonable listener would take the interview as factual.

With respect to Exhibit 8, Defendant testified that it contains a social media post he wrote on March 15, 2025 [Exh. 8]. He wrote in the post, "You like my bars?" [*Id.*]. Defendant acknowledged that the post related to his statements about Plaintiff. In addition, Defendant's post included a post by Erin Brown ("Mr. Brown"), a former track and field athlete and content creator in the track and field space. Mr. Brown's post states, "On the first track, [Defendant] boldly declares that their next encounter could turn physical, stating, 'It's on sight with the hands'" [*Id.*]. Defendant testified that he made a statement about being physical in a song, but it was not serious; it was just music. Defendant tagged Danny White, the University's athletic director, in his March 15 post.

Defendant testified that he sent an email dated December 5, 2025, to various individuals at the University's athletic department and rival schools in the Southeast Conference [Exh. 9; *see also* Doc. 44 pp. 31–38]. Defendant asserted that there are no defamatory statements in this email, he was making jokes and trolling, the email contained a fictional story, and he was promoting his music. He testified that he did not think a recruit would decline to come to the University because of his music.

Defendant acknowledged that he sent the May 30 Letter making a monetary demand [Exh. 9; *see also* Doc. 44 pp. 25–27]. Plaintiff asked Defendant about the following statement:

> Past Misconduct: **Duane Ross has a documented history of questionable behavior. He received a 2-year suspension from the U.S. Anti-Doping Agency for using performance-enhancing drugs, disqualifying all his results since November 2, 2001. His**

> **involvement in the BALCO steroid case further underscores his troubled past.**

("Past Misconduct Statement") [Doc. 44 p. 26]. Defendant testified he relied on information from ESPN and the U.S. Anti-Doping Agency ("USADA") when he made this statement. Defendant explained that he did not state Plaintiff testified positive for using performance-enhancing drugs ("PEDs") and that he does not know if Plaintiff tested positive.

In addition, Plaintiff asked about another statement in the May 30 Letter:

> Athlete Violations ***Under His Watch: Under Duane Ross's leadership, North Carolina A&T faced multiple suspensions of top athletes for doping violations. Grace Nwokocha was suspended right before the World Championships for doping. Additionally, Ross used an athlete who was not cleared by the NCAA, resulting in the forfeiture of team titles and performances. These incidents, though they occurred before his tenure at Tennessee, are closely tied to him and paint a picture of ongoing integrity issues.***

("Athlete Violations Statement") [Doc. 44 p. 26]. Defendant testified that Plaintiff coached Grace Nwokocha in 2022 when she got suspended. He stated that he did not think he negatively impacted Plaintiff's reputation or credibility and that he did not intend to do so in the May 30 Letter. Instead, he submitted that he was trying to rectify a situation where he had been wrong.[3]

### B. Plaintiff's Testimony

Plaintiff testified on direct examination that he is the director and head coach of the University's track and field program. He graduated from Clemson University and ran professionally for eleven years. He achieved a bronze medal at the world championships and at the 2004 Olympics. Following that, he was an investment advisor and then eventually became a

---

[3] Following the April 29, 2026, the parties submitted a Joint Status Report Regarding Preliminary Injunction Hearing ("Report"). The parties represented, "Defendant Lambert does not intend to offer any direct testimony at the continued hearing" [Report ¶ 2]. Defendant confirmed at the June 30, 2026, that he did not have any further testimony to offer.

coach at the Methodist University in Fayetteville, North Carolina. He was named coach of the year four times while at the Methodist University and then began coaching at North Carlina A&T, where he was the head coach for ten years. During his tenure at North Carolina A&T, he was the national coach of the year, a sixteen-time regional coach of the year, and his teams went to the NCAA championship several years.

Currently, Plaintiff has professional athletes that he coaches who are sponsored by Nike. Nike pays the athletes a coaching stipend, and the athletes use it to pay Plaintiff to coach them. He also works at the University, where he began working in May 2022. With respect to his personal background, Plaintiff testified that he has been in a relationship with his girlfriend for about fifteen years with whom he shares two daughters.

Plaintiff submitted that he met Defendant before he accepted the head coach position at the University. He characterized Defendant as a fan. When Plaintiff accepted the job at the University, he had an entry level position as a recruiter coordinator open. While Plaintiff was advised not to hire Defendant, Plaintiff stated he did so anyway. Plaintiff testified, however, that the administration reprimanded him due to Defendant's quality of work and lack thereof. Plaintiff noted other employees, coaches, and students complained of Defendant's behavior and that Defendant and Ms. Love did not get along. The last straw, Plaintiff stated, occurred when Defendant left recruits at the airport.

Following the incident at the airport, Plaintiff stated that he asked Defendant to resign and that if he did not, Plaintiff would terminate his employment. Afterwards, Defendant filed a complaint at the Equal Employment Opportunity Commission ("EEOC"), which it dismissed. Plaintiff testified that following the EEOC's dismissal, Plaintiff sent the May 30 Letter making a settlement demand [*See* Exh. 9; *see also* Doc. 44 pp. 25–27]. Plaintiff submitted that the Past

Misconduct Statement in the May 30 Letter was not true. He stated that he has never tested positive for using PEDs or any banned substance. With respect to Defendant's reference to BALCO, Plaintiff explained that it is a company that provided supplements to athletes back in the day. Plaintiff stated that Defendant is trying to tie him to this company, but Plaintiff has never met the founder or ordered anything from it. He acknowledged that he had been suspended from USADA. He submitted that he stopped competing in 2004 and that two years later, USADA tried to use athletes to build cases against other athletes. Plaintiff stated that USADA gave him a circumstantial suspension because he refused to cooperate by testifying against other coaches or athletes. He asserted he has never taken any banned supplements, never tested positive, and was not suspended for using PEDs.

Plaintiff testified about another statement in the May 30 Letter:

> Family Issues: **His son, Randolph Ross Jr., has also been suspended for doping violations. Randolph Ross Jr.'s suspension through June 30, 2025, for whereabouts failures and tampering with an email raises questions about the environment and influence under Duane Ross's watch.** ***Where do you think he learned that from?***

("Family Issues Statements") [Doc. 44 p. 26]. Plaintiff asserted that the first sentence is not true. He stated his son has never tested positive for using PEDs. Instead, Plaintiff explained his son was suspended from USADA for a whereabouts violation. According to Plaintiff, a whereabouts violation occurs when, after three times, USADA arrives to test an athlete, but he is not present. He explained that his son's suspension was procedural, and it did not involve doping violations.

Turning to the Athlete Violations Statement, Plaintiff testified that the first sentence is not true. With respect to the second sentence, Plaintiff acknowledged that Grace Nwokocha was suspended for using a PED at a competition. This competition, however, was a professional competition and not a collegiate one. Plaintiff coached her at North Carolina A&T in 2021, and

15

her suspension occurred in 2022. At that time, Plaintiff stated that he was employed at the University. As to the third sentence, Plaintiff explained while he was at North Carolina A&T, the administration deemed an athlete eligible to compete but later realized that was a mistake. The mistake was that she did not have an outdoor season, meaning she could not compete outdoors. The University discovered the mistake and self-reported it to the NCAA. In light of her ineligibility, the NCAA took her points back from one competition. Plaintiff submitted this resulted in the University finishing second instead of first in the conference standings. Plaintiff stated that during his tenure at the University, a student athlete from Nigeria enrolled and was deemed eligible to compete. He ran in one competition in January, and later, Plaintiff learned that he had a positive test for PEDs in Nigeria. Plaintiff alerted the University's administration, and the student athlete was immediately removed from the team. Other than that, Plaintiff asserted that no student testified positive or was suspended for banned drugs.

Plaintiff stated that he is aware of rumors that the use of PEDs is prevalent at the University, but those rumors were spread by Defendant. Plaintiff claimed that Defendant spreads these rumors to parents, recruits, and Plaintiff's bosses, and in his songs. He testified that Defendant spread a rumor that he had a romantic relationship with Ms. Love and that he fathered her child. Plaintiff denied having a sexual relationship with Ms. Love and stated that he is friends with her husband. Before the rumors started, Plaintiff claimed, his family and Ms. Love's family were close, but now, they have not spoken in a year. Plaintiff stated that she left the University to take care of her four daughters and because of the negativity around Defendant's lies. These rumors, according to Plaintiff, have created an environment of mistrust. He later testified that Defendant's speech ruined his relationship with Ms. Love and her husband.

Recently, Plaintiff claimed, Defendant sent emails to his counsel, while copying Plaintiff and various others, including coaches, media outlets, and individuals at the University [Exh. 11]. According to Plaintiff, he continues to send his counsel emails, while copying Plaintiff and his bosses [*See* Exhs. 12–14]. In one recent email, dated June 28, 2026, Plaintiff stated Defendant included an AI-generated photograph of him with the rapper, P. Diddy, both of whom are endorsing Bluechew, an erectile dysfunction pill [Exh. 15 p. 6]. With respect to Exhibit 16, Plaintiff stated that it is an AI-generated collage of photographs that Defendant sent to Plaintiff, his counsel, individuals at the University, and then posted it on social media [Exh. 16]. The photographs include Plaintiff posing with other individuals, including his counsel and Jeffrey Epstein [*See id*.]. Plaintiff asserted that the photographs are highly offensive. He testified that he has received dozens of correspondences from people denouncing Defendant's conduct.

Plaintiff testified that Defendant's conduct has affected his personal and professional life. He stated that it has created an environment of mistrust within his administration. In addition, Plaintiff asserted that Defendant sends emails to competitor schools for negative recruiting purposes. Other coaches, according to Plaintiff, are using Defendant's statements to recruit for their own schools. For example, these competing schools are now telling recruits that Plaintiff has romantic relationships with his assistant coaches, students will be on drugs if they attend the University, and Plaintiff will not be employed at the University for long. Plaintiff also stated that he lost two potential candidates for coaching positions because of Defendant's lies. One candidate told Plaintiff that he knew Defendant was telling lies, but it was "just too much to deal with." The other candidate feared the University would terminate Plaintiff's employment. In addition, Plaintiff claimed that Defendant is emailing, texting, and calling his assistant coaches and harassing them. Plaintiff held a meeting so that he could tell his staff to ignore Defendant and that

17

the University was not terminating Plaintiff's employment. Plaintiff also had to individually meet with his coaches over Defendant's speech. According to Plaintiff, he has had staff leave over the issues with Defendant.

Plaintiff asserted that Defendant's speech has also impacted his relationship with the track and field community at large. For example, Plaintiff's agent told him that before Defendant's speech, "any school in the country would have been calling [Plaintiff] for [his] service." Plaintiff claimed that he had institutions reach out to him yearly, but his agent told him there were several openings and that "these institutions wouldn't have hesitated to reach out if it wasn't for this guy spewing this nonsense and trying to destroy your reputation." Plaintiff contended that Defendant's speech had a tangible negative impact on his marketability as a coach.

Moreover, Plaintiff stated that Defendant's speech also had a financial impact on him. Plaintiff coached an athlete who signed a lucrative deal to run professionally, but the athlete told Plaintiff that he was training elsewhere to avoid Defendant's negativity. According to Plaintiff, it has also affected his relationship with Nike. Plaintiff testified that he had to have a conversation with individuals at Nike about Defendant's speech because a company does not want to affiliate itself with a man who is rumored to have fathered his assistant coach's child and is giving drugs to athletes.

Further, Plaintiff testified that Defendant's speech has affected his relationship with his girlfriend. He stated that she knew Defendant's statements were lies, but the constant bullying and harassment affected her. She was stressed that Defendant used a photograph of her children. Defendant's speech, Plaintiff claimed, also affected his children.

According to Plaintiff, recruiting is the life blood of his track and field team. He elaborated that if he does not have quality athletes, his team does not score points. A good athlete, Plaintiff

stated, is also good for the team's environment. He claimed that recruiting can make or break his job. Plaintiff asserted that Defendant's actions have affected his ability to recruit, explaining that Defendant stalks the University and the athletes it tries to recruit. If an athlete visits the University, Defendant will follow him/her online and use the athlete's photographs to make videos to discourage him/her from attending the University. Plaintiff claimed that recruits' parents have told him that they are afraid Defendant will target their children.

Plaintiff also testified that Defendant's actions affect him personally, which includes his job performance, mental state, stress level, and leadership abilities. It also affects, Plaintiff added, the program.

On cross examination, Plaintiff testified that he signed a verification swearing that he read the Complaint and the contents thereof were true. He acknowledged that the Complaint did not include a DNA test, a birth certificate, court record, medical record, or a sworn witness statement about the paternity allegations.

Plaintiff stated that on February 27, 2021, he participated in an interview after a championship game while he was the head coach at North Carolina A&T [*See* Exh. A]. As part of the interview, he mentioned that other coaches were accusing his athletes of using drugs. This interview, Plaintiff acknowledged, was publicly circulated on social media. Plaintiff stated that he is familiar with LetsRun.com, but he is not a member [*See id.*]. He does not maintain the University's Instagram account, nor does he have the authority over, or give input about, the University's Instagram.

Plaintiff testified that he has not submitted any documents that show Defendant's statements about him are false. He stated that Defendant's actions targeted everyone, including the track and field community, recruits who do not reside in Tennessee, and the University's rival

19

schools. He cannot identify a Tennessee recruit who has changed his/her opinion about attending the University over Defendant's statements. But he claimed an out-of-state recruit changed his mind about attending the University over Defendant's statements. He acknowledged he had not produced a text, email, or recording from a recruit's parent stating that Defendant's content caused the recruit not to attend the University. He has not, Plaintiff testified, produced a computation of damages that is separate from harm that occurred in Tennessee and harm that occurred nationally.

Plaintiff identified his signature on his employment agreement with the University [Exh. B]. Plaintiff stated that he is still the head coach at the University, and he has not been suspended or demoted as a result of Defendant's actions. His annual salary has not changed. Plaintiff claimed that his team finished third place out of eleven at the NCAA championship and that he will receive bonuses for that result. Since the release of Defendant's music, Plaintiff has continued to recruit student athletes, and he has not been stripped of any coaching awards and honors. He is ranked in the top ten among head black coaches in the country. Plaintiff testified, however, that Defendant's music causes him reputational harm.

Plaintiff is vaguely familiar with the NCAA bylaws. Bylaw 11.1.1.1 discusses the responsibility of the head coach and states, "An institution's head coach shall be held responsible for the head coach's actions and the actions of all institutional staff members who report, directly or indirectly, to the head coach" [Exh. E]. While he was the coach at North Carolina A&T, Plaintiff testified the women's track and field team was not stripped of its Big South Championship. One article stated, "After showing out at the Big South conference track and field championships, North Carolina A&T women's track team was stripped of its team title, the league announced Friday" [Exh. D]. Plaintiff asserted that the word "stripped" was an incorrect term. He claimed that the forfeit was reported before Defendant released any of the music referenced in the lawsuit.

20

Plaintiff stated that Grace Nwokocha received a provisional suspension after her time as an athlete at North Carolina A&T. Her suspension occurred before Defendant released his music that is referenced in the Complaint. He testified that Duane Ross Jr. is his son and that he did not receive a violation for tampering with an antidoping procedure. But his son was suspended, which was reported by various media outlets in the track and field community before Defendant released his content. Plaintiff acknowledged that one of his athletes was suspended for a violation committed before arriving at the University. This athlete competed in one competition during his tenure at the University, and Plaintiff later learned that he had tested positive for PEDs before arriving on campus. Plaintiff acknowledged that he was suspended in 2001.

Plaintiff filed this lawsuit in his individual capacity and not on behalf of the University. The University is not a party to this action. He did not seek or obtain authorization from the University before filing this lawsuit. Plaintiff filed his Complaint under the penalty of perjury. Although the Complaint incorrectly states he is married, Plaintiff explained that he and his counsel missed that error. The Complaint also stated that he has three children, but he only has two children with his current girlfriend.

Plaintiff acknowledged that he regularly interacts with the media as part of his head coaching job and that his athletes have competed at the Olympic games and world championships. He asserted he is a public figure in the track and field community. The University is publicly funded, and Plaintiff stated that he has published his professional biography on the University's athletic web page. The University extended Plaintiff's contract before Defendant's actions.

On redirect examination, Plaintiff identified recruits who did not come to the University because of Defendant's actions. One athlete was the top recruit in the country, but he decided to attend Texas Tech. On the night he did so, Defendant sent Plaintiff a text message boasting that he

21

was the reason Plaintiff lost a recruit. If any of the allegations in the May 30 Letter were true, Plaintiff testified that he would not have been hired by the University. Plaintiff stated that he filed a Verified Statement in the record [*See* Doc. 26].

Plaintiff testified that one of his responsibilities as head coach at the University is to meet with alumni and donors. Due to Defendant's actions, Plaintiff stated that responsibility has been removed. He stated that Defendant's song S.L.A.P. [*see* Exh. 6] suggested that Plaintiff engaged in an extra martial affair and fathered a child. The reference to "checking timelines behind the scenes" refers to Plaintiff and Ms. Love getting together to discuss when she got pregnant and whether the child was Plaintiff's or Ms. Love's husband's child.

On recross examination, Plaintiff testified that the above testimony was his interpretation of the song S.L.A.P. Plaintiff asserted that this song and Defendant's social media posts are malicious lies. Plaintiff stated that Defendant made a fake interview and called Ms. Love his "baby's mama."

## III.  ORAL ARGUMENT

Following the testimony at the June 30 hearing, Plaintiff argued the purpose of seeking the preliminary injunction is to maintain the status quo. He asserted that he is seeking to halt Defendant's conduct until a trial on the merits of his defamation and false invasion of privacy claims can occur. In determining whether an injunction should issue, Plaintiff submitted that the Court must analyze four factors but a finding on two of those factors—likelihood of success and irreparable harm—is sufficient. He argued that he has established those two factors. Plaintiff stated that he established Defendant made direct and indirect accusations that Plaintiff took banned substances, tested positive for banned substances, was suspended for taking banned substances, and that his players used banned substances. Plaintiff also noted that Defendant made accusations

22

that he had a relationship with his assistant coach, and he has made deep fake videos of Plaintiff. Plaintiff argued that he is not required to prove his case at this juncture, but instead, he must show that there is more than a mere possibility that he might prevail based on the evidence. According to Plaintiff, he has done so here. In addition, Plaintiff explained that he has shown reputational harm, which is irreparable. He stated that his ability to perform as a high-level coach and ability to recruit have been damaged, he has a strained relationship with his employer, and that his relationships with his coaches, administration, and friends have been damaged. Because Plaintiff is a public figure, he acknowledged that he must also establish malice with respect to his defamation claim but argued he has done so.

Moreover, Plaintiff denied he is seeking a prior restraint on Defendant's speech. Instead, Plaintiff asserted he is asking the Court to prevent harmful conduct, including emailing Plaintiff's employer, emailing and texting Plaintiff, and emailing and communicating with recruits and their parents. Plaintiff acknowledged that the Court cannot prohibit pure speech at this stage but insisted that he was not asking for that relief. He submitted that Defendant's conduct is ongoing and that the Court should take the necessary steps to protect Plaintiff until the trial.

Defendant responded that his actions related to matters of public concern. He submitted that his videos contain a disclaimer that they are created with AI and that his lyrics cannot be taken as verified facts. He denied ever claiming his statements were verified facts. Defendant argued that Plaintiff has not identified one specific provable false statement. But before reaching the relevant factors on whether an injunction may issue, Defendant asserted that the Court must review Plaintiff's employment contract with the University. Defendant claimed that Plaintiff is asserting harm to his recruiting ability and program standing, but he does not have the University's

23

authorization to file this lawsuit. Plaintiff therefore, Defendant contended, cannot bring such claims.

To the extent the Court considers the relevant factors for an injunction, Defendant argued that Plaintiff has not met his burden. Defendant asserted that Plaintiff is a public figure and this is a matter of public concern. Defendant argued that Plaintiff has not shown irreparable harm as his program finished third in eleven; he has gained recognition and awards; and that during the relevant period, Plaintiff had his best career and tenure at the University. Moreover, Defendant argued, Plaintiff waited ten months before he took any action. According to Defendant, Plaintiff's silence undermines his claim of irreparable harm.

Further, Defendant asserted that Plaintiff's request constitutes a prior restraint of speech. He argued that a prior restraint is presumed to be unconstitutional and that restraining his speech before any false statements have been identified does not balance the harm. He claimed that this case relates to a public university and a public dispute and that the public interest favors caution before silencing speech on a matter of public concern. In addition, Defendant argued that Plaintiff pleads broad harm in the United States track and field community, but he has not identified one Tennessee resident or recruit that he lost. Defendant stated that he is a Maryland resident, the internet is worldwide, and he made the content in Maryland.

Plaintiff replied that he has shown likelihood of success on the merits because he can point to three statements that are not true. First, in the May 30 Letter, Defendant stated that Plaintiff received a two-year suspension from USADA for using PEDs, but that is false. Second, in the May 30 Letter, Defendant stated that under Plaintiff's leadership, North Carolina A&T faced multiple suspensions of top athletes for doping violations, and that is false. Citing to Exhibit 5, Plaintiff submitted that Defendant claimed Plaintiff fired his "baby mama." That too, Plaintiff

24

asserted, is false. With respect to Defendant's argument about the ten-month delay, Plaintiff argued it is not supported by the case law. Plaintiff noted that Defendant's actions started with the May 30 Letter and then continued for two years. Plaintiff asserted he finally had enough and that Defendant's actions are continuing. As to Defendant's arguments that the University did not authorize this lawsuit, Plaintiff called them nonsensical. Plaintiff denied that this case is about the University's harm. Plaintiff stated that he has shown Defendant made knowingly false statements with malice and that he purposefully and intentionally placed Plaintiff in a negative false light in which any reasonable person would find offensive. According to Plaintiff, the Supreme Court has recognized an individual's right to free speech, but defamatory speech is not protectable speech.

Defendant asserted that Plaintiff has not proven his case. Defendant stated that his posts have a disclaimer and that he has never presented his videos as verified facts. He denied his online statements were defamatory.

## IV. ANALYSIS[4]

"Under Federal Rule of Civil Procedure 65, a party may seek injunctive relief if it believes it will suffer irreparable harm or injury during the pendency of the action." *F.S. Sperry Co. v. Schopmann*, 304 F. Supp. 3d 694, 700 (E.D. Tenn. 2018). "If a defendant is on notice . . . a request for a temporary restraining order may be treated as a motion for a preliminary injunction." *Id*. (citing Fed. R. Civ. P. 65(a)(1)). Given that Defendant has notice here, the undersigned considers only Plaintiff's request for a preliminary injunction.

---

[4] The undersigned recommends that the District Judge deny the request for a preliminary injunction at this time because it constitutes a prior restraint on speech. Because of that recommendation, the undersigned need not address Defendant's argument related standing, personal jurisdiction, and venue, which are the subjects of a motion pending before the District Judge [Doc. 17] that has not been referred to the undersigned.

25

Courts weigh four factors when determining whether to grant preliminary injunctive relief:

> (1) whether plaintiff "has shown a strong likelihood of success on the merits"; (2) whether plaintiff will suffer irreparable injury in the absence of an injunction; (3) whether the injunction will cause substantial harm to others; and (4) whether the injunction would serve the public interest.

*Ross v. Parrish*, No. 3:23-CV-15, 2023 WL 2484775, at *5 (E.D. Tenn. Mar. 13, 2023) (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). The moving party bears the burden to show the factors weigh in its favor. *Volkswagen Grp. of Am. Chattanooga Operations, LLC v. SK Battery Am., Inc.*, No. 1:23-CV-246, 2024 WL 718170, at *2 (E.D. Tenn. Jan. 10, 2024) (citation omitted). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573 (citation omitted). This burden is a "heavy one," *Hum. Rts. Def. Ctr. v. Winn*, 431 F. Supp. 3d 925, 943 (E.D. Mich. 2020), and "is much more stringent than the proof required to survive a summary judgment motion," *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).

Plaintiff asks that the Court enter a preliminary injunction to prevent Defendant from:

> (1)    Contacting [Plaintiff] directly by any means, including in-person communications, letters, emails, text messages or other similar electronic communications;
>
> (2)    Sending communications by any means, including in-person communications, letters, emails, text messages or other similar electronic communications, that contain defamatory or disparaging statements about [Plaintiff] to any: (i) employee of the University of Tennessee; (ii) employee of any university, college, or school that maintains a collegiate track and field program; and (iii) any high school student or collegiate athlete, as well as their respective family members and coaches, that are current or prospective recruits of the

26

University of Tennessee or any other Division 1 collegiate program;

(3) Publishing defamatory, disparaging, or offensive material that relates in any way to [Plaintiff] or his family, including but not limited to videos, photographs, music, blogs, interviews, or articles, on any social media platform, app, music streaming service, print media, mass media or digital media; and

(4) Making any public statements about the present litigation, [Plaintiff], [Plaintiff's] family members, the University of Track and Field program, or any individuals other than [Plaintiff] that are affiliated in any way with the University of Tennessee Track and Field program.

[Doc. 2 pp. 1–2; *see also* Doc. 29 p. 7].

Because Plaintiff's proposed injunction seeks to prevent Defendant from making certain statements, the Court must first consider whether it constitutes a prior restraint in violation of the First Amendment. *See Williams v. Rigg*, 458 F. Supp. 3d 468, 475 (S.D. W. Va. 2020) ("As a preliminary matter, this Court must determine whether [the defendant's] First Amendment rights would be implicated by the issuance of an injunction on this basis.").

"The First Amendment prohibits 'abridging the freedom of speech,' and the United States Supreme Court has interpreted this prohibition to forbid, among other things, 'prior restraints.'" *Id.* at 476 (citations omitted). "[P]ermanent injunctions—i.e., court orders that actually forbid speech activities—are classic examples of prior restraints." *Cnty. Sec. Agency v. Ohio Dep't of Com.*, 296 F.3d 477, 485 (6th Cir. 2002) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)); *see also Williams*, 458 F. Supp. 3d at 476 ("The United States Supreme Court has established that injunctions to enjoin libel are considered prior restraints." (citing *Tory v. Cochran*, 544 U.S. 734, 738 (2005)). The Sixth Circuit has explained, "[I]n the case of a prior restraint on pure speech, the hurdle is substantially higher: publication must threaten an interest more

27

fundamental than the First Amendment itself." *Cnty. Sec. Agency*, 296 F.3d at 485 (quoting *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226–27 (6th Cir. 1996)). The plaintiff's burden to establish that a prior restraint is warranted is heavy but "not impossible to overcome." *Id.* Even so, "[P]rior restraints on speech and publication are the most serious and least tolerable infringement on the First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

Plaintiff claims that "the relief sought is narrowly tailored to protect [him] from serious and consequential harm while placing only minimal limitations on Defendant Lambert's First Amendment right to free speech" [Doc. 2-1 p. 18].

Defendant responds that Plaintiff's injunction constitutes a prior restraint and that "[c]ourts almost never enjoin speech in advance, especially where damages or post-publication remedies exist" [Doc. 22 p. 4 (citation omitted)]. He claims that "Plaintiff does not narrowly tailor the requested relief[,]" but "[i]nstead, he seeks to broadly silence commentary, art, and expression relating to himself" [*Id.*]. "Such a request[,]" Defendant submits, "is facially unconstitutional" [*Id.*].

Plaintiff replies that his proposed injunction does not prohibit speech [Doc. 29 p. 7]. "Instead," Plaintiff seeks "to limit [Defendant's] potential conduct—not pure speech—that serves to protect his legitimate interests as well as those of the public at large" [*Id.*]. "Specifically," Plaintiff claims that he "requests that the Court (i) prohibit [Defendant] from any further direct contact with [him] via email, text or other similar electronic communications; (ii) enjoin [Defendant] from directly communicating with [Plaintiff's] employer (the University of Tennessee)], other schools with collegiate track and field programs that compete with the University of Tennessee, or any current or prospective track and field recruits of the University of

28

Tennessee about [Plaintiff]; and (iii) creating new deepfake AI generated videos or photographs of [Plaintiff] or his family members and publishing them on social media or other digital media platforms" [*Id.* at 7–8].

The undersigned is not convinced that Plaintiff's request does not regulate Defendant's speech. He asks the Court to enjoin Defendant from communicating with Plaintiff and others about Plaintiff, publishing statements about Plaintiff, and making any public statements about certain topics [Doc. 2 p. 3; *see also* Doc. 29 p. 7]. In other words, he asks the Court to regulate Defendant's speech. *See Saidak v. Schmidt*, 501 F. Supp. 3d 577, 594 (E.D. Tenn. 2020) (finding the plaintiff's proposed injunction, "barring him from making any public comments about this litigation, [p]laintiff, Legends Brass, ORNL, Pickett Brass, Pickett-Blackburn Brass, the Church, or any other members of [p]laintiff's family" implicated the First Amendment because it sought to prohibit the defendant "from making certain statements"); *Williams*, 458 F. Supp. 3d at 480 (finding the plaintiff's request to enjoin the defendant from selling his book about the plaintiff to protect the plaintiff from reputational harm was "a direct encroachment upon the rights and guarantees embodied in the First Amendment"); *Banks v. Jackson*, No. 120CV02074, 2020 WL 6870739, at *1 (D. Colo. Oct. 2, 2020) ("Under the [p]laintiffs' requested injunction, the court would prohibit [the defendant] from speaking, writing, or publishing regarding the [p]laintiffs. This kind of prohibition is known in legalese as a 'prior restraint,' which 'is just a fancy term for censorship.'" (quoting *McCarthy v. Fuller*, 810 F.3d 456, 461 (7th Cir. 2015)).[5]

---

[5]     Plaintiff relies on *Raymond James & Assocs., Inc. v. Saba*, No. 1:25-CV-10, 2025 WL 240986, at *5 (S.D. Ohio Jan. 17, 2025), in support of his argument [Doc. 29 p. 8]. But in that case, the court declined to "grant [p]laintiffs' broad request to enjoin [d]efendant's speech . . . because it would amount to a prior restraint before a final adjudication." 2025 WL 240986, at *5. Instead, the court entered an injunction restricting the defendant from accessing his fake email accounts or creating new email accounts to further his cyber-harassment campaign. *Id.* The

29

Given that, "the factors for granting a preliminary injunction essentially collapse into a determination of whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Saidak*, 501 F. Supp. 3d at 594 (quoting *Thompson v. Hayes*, 748 F. Supp. 2d 824, 831 (E.D. Tenn. 2010)).

Plaintiff does not argue that the injunction is warranted to prevent an interest more fundamental than the First Amendment itself. Instead, Plaintiff claims that "the relief sought is narrowly tailored to protect [him] from serious and consequential harm while placing only minimal limitations on Defendant Lambert's First Amendment right to free speech" [Doc. 2-1 p. 18]. That is not sufficient to restrict Defendant's First Amendment rights at this juncture. *See Cnty. Sec. Agency*, 296 F.3d at 485 ("A prior restraint is permissible if the restrained speech poses 'a grave threat to a critical government interest or to a constitutional right.'" (quoting *Procter & Gamble*, 78 F.3d at 225, 227)); *CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975) ("[T]o justify imposition . . . of a prior restraint, the activity restrained must pose a clear and present dangerous threat to a protected competing interest." (citations omitted)); *see also Banks*, 2020 WL 6870739, at *1 (finding that the plaintiffs' request that the court prohibit the defendant from speaking, writing, or publishing about the plaintiffs is a "prior restraint [that] has been roundly rejected" (citation omitted)); *Thompson*, 748 F. Supp. 2d at 831 (finding the plaintiffs' alleged harm "these communications have done and will do to plaintiffs' business interests and their reputations . . . cannot override defendant's First Amendment rights" (citation omitted)).

Moreover, although Plaintiff characterizes his proposed injunction as "narrow in scope" [Doc. 2 p. 2], the Court finds otherwise. Plaintiff seeks to enjoin Defendant from sending

---

undersigned therefore finds this case inapposite and not supportive of Plaintiff's requested injunction here.

"defamatory or disparaging statements" to various individuals and entities [*Id.*] "An injunction against defamatory statements, if permissible at all, must not through careless drafting forbid statements not yet determined to be defamatory, for by doing so it could restrict lawful expression." *McCarthy*, 810 F.3d at 462. He also seeks to enjoin Defendant from "[m]aking any public statements" about certain topics [Doc. 2 p. 2; *see also* Doc. 29 pp. 7–8]. This is overly broad. *See Tory v. Cochran*, 544 U.S. 734, 736 (2005) (finding an injunction that prohibited the plaintiffs from "orally uttering statements" about the defendant and his law firm in "any public forum" was overly broad and "lack[ed] plausible justification" (citations omitted)); *see also Renoir-Large v. Lane*, No. 2:11-CV-0023, 2011 WL 3667424, at *4 (S.D. Ohio July 20, 2011) (finding the plaintiffs' injunction was overly broad because it "impose[d] restrictions that capture[d] activity that is not defamatory"), *report and recommendation adopted*, No. 2:11-CV-0023, 2011 WL 3678177 (S.D. Ohio Aug. 22, 2011).

The undersigned therefore finds that Plaintiff's request for an injunction constitutes a prior restraint, and he has not shown at this juncture that Defendant's speech threatens an interest more fundamental than the First Amendment itself. *See Studiorotan LLC v. Howell*, No. 2:25-CV-20, 2025 WL 3041940, at *11 (N.D. Ala. Oct. 31, 2025) ("[I]t would be extraordinary for a federal court to enter a preliminary injunction on a defamation claim." (citation omitted)); *Goodson v. Republican State Leadership Comm. - Jud. Fairness Initiative*, No. 4:18-CV-791, 2018 WL 6430825, at *3 (E.D. Ark. Nov. 1, 2018) ("It appears wholly unprecedented, however, for a federal court to enter a *preliminary* injunction in a defamation case. In those defamation cases upholding the constitutionality of restraints on future speech, the injunctions were entered *after*

31

the claims were adjudicated on the merits, and the injunctions were limited to the speech that was *actually found* to be defamatory by the fact-finder." (citations omitted).[6]

Considering this finding, the undersigned need not separately address the four factors relevant to a request for an injunction. *See Williams*, 458 F. Supp. 3d at 480 ("[R]uling on this preliminary injunction request would require this [c]ourt to pass judgment on the falsity of [the defendant's] speech and the potential damage this speech may cause to [the plaintiff's] reputation. The [c]ourt declines to make such a finding before a final determination on the merits and is unable to make such a determination on the record currently before it."); *see also Studiorotan LLC*, 2025 WL 3041940, at *11 (denying motion for preliminary injunction and refusing to "pass judgment on the truth or falsity of [defendant's] speech and its potential harm" (quoting *Williams*, 458 F. Supp. 3d at 479)); *Am. Univ. of Antigua Coll. of Med. v. Woodward*, 837 F. Supp. 2d 686, 690 (E.D. Mich. 2011) ("The Court did not make a finding with regard to [the plaintiff's] likelihood of success on its defamation claim, but denied injunctive relief based on that claim due to the First Amendment's heavy presumption against prior restraints and nearly two centuries of widespread acceptance at common law that equity will not enjoin a defamation." (citation modified and

---

[6]    Plaintiff relies on *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206, 1209 (6th Cir. 1990), and *In re Conservatorship of Turner*, No. M2013–01665–COA–R3–CV, 2014 WL 1901115, at *20 (Tenn. Ct. App. May 9, 2014), stating that they recognize or adopted the "modern rule" that permits injunctions restricting defamation [Doc. 2 p. 2]. But the modern rule to which Plaintiff refers relates to courts entering injunctions after a determination on the merits. *Saidak*, 501 F. Supp. 3d at 595; *see also Williams*, 458 F. Supp. 3d at 477 ("Six federal circuit courts of appeal have held that injunctions are permissible to prevent libel, but only after a finding on the merits that the speech is unprotected." (collecting cases and footnote omitted)); *Renoir-Large*, 2011 WL 3667424, at *4 ("Here, although the usual rule provides that defamation may be remedied only by an action for damages, even application of the modern rule bars plaintiffs' requested injunction" because "there has been no final determination that defendant's statements are false and libelous." (citing *Lothschuetz,* 898 F.2d at 1206)).

32

citations omitted));.*Thompson*, 748 F. Supp. 2d at 831 (finding the plaintiffs' request to enjoin the defendant's speech was an impermissible prior restraint without considering the four factors).

## V.  CONCLUSION

For the reasons explained above, the undersigned **RECOMMENDS**[7] that the District Judge **DENY** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction Against Defendant Greg Lambert [**Doc. 2**].

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

[7]  Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).