UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| RANDOLPH DUANE ROSS,<br><br>Plaintiff,<br><br>v.<br><br>GREG LAMBERT,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.: 3:26-CV-13-TAV-JEM |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on defendant's Motion to Dismiss [Doc. 17], pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6). Plaintiff has responded [Doc. 27], and defendant has replied [Doc. 28]. Therefore, the motion is ripe for review. E.D. Tenn. L.R. 7.1(a). For the reasons set forth below, defendant's Motion to Dismiss [Doc. 17] is **GRANTED in part** and **DENIED in part**.

## I. Background

Plaintiff alleges that he is an accomplished track and field athlete who has held numerous collegiate coaching positions over the past ten years, including Head Coach and Director of Track and Field at the University of Tennessee ("UT") beginning in 2022 [Doc. 44 ¶¶ 18–19].[1] During his employment with UT, plaintiff states that defendant, a former collegiate runner, approached him seeking to join his staff [*Id.* ¶ 20]. Plaintiff submits that he hired defendant in August 2022 to serve as the Track and Field Recruiting Coordinator

[1] To note, the complaint was refiled with redactions [Doc. 44], with the original being sealed [Sealed Doc. 1], due to it containing a photograph of minors who are not parties to this action [*See* Doc. 43].

[*Id.*]. From the outset, plaintiff alleges, defendant was an unreliable employee who performed his duties in a substandard and unprofessional fashion [*Id.* ¶ 21]. Consequently, in May 2023, plaintiff advised defendant that he was being terminated from his position at UT [*Id.* ¶ 22]. Plaintiff claims that he gave defendant the option to voluntarily resign in lieu of being fired for cause, which defendant accepted [*Id.*].

Defendant subsequently filed an EEOC complaint against plaintiff and UT, plaintiff asserts, but this case was closed without a finding of probable cause against either plaintiff or UT [*Id.* ¶ 23]. Then, on or about May 30, 2024, defendant sent a demand letter to UT's Office of General Counsel, threatening to sue UT and plaintiff for "wrongful termination and discrimination" if he did not receive a $150,000 payment from UT [*Id.* ¶ 24 (citing *id.* at 25–27)]. Plaintiff alleges that, within the demand letter, defendant made a series of "patently false and inflammatory allegations" against plaintiff, which included statements claiming that plaintiff and plaintiff's son were involved in "doping" [*Id.* ¶¶ 25–26]. Defendant also warned in his demand letter that he would go to the media if UT did not settle [*Id.* ¶¶ 25, 27]. In response, UT rejected defendant's demand, citing to his "baseless" and "highly offensive" attack on plaintiff's reputation, and advised defendant that it was unwilling to engage further with defendant on the matter [*Id.* ¶ 28].

Defendant never filed a lawsuit, plaintiff submits [*Id.* ¶ 29]. Instead, plaintiff claims that defendant initiated a "vindicative and wide-ranging campaign that spread untruthful and malicious information" about plaintiff and portrayed plaintiff "in a highly offensive and negative light throughout the track and field community" [*Id.*]. In more detail, plaintiff alleges that on or about March 3, 2025, defendant, using a pseudonym, released two songs

on Apple Music and Spotify, both of which contain defamatory lyrics impugning plaintiff's character [*Id.* ¶ 30]. Specifically, plaintiff claims that these songs contain allegations of drug use on the part of plaintiff, describes plaintiff as untrustworthy and of low character, and warns parents to not entrust their children to plaintiff [*Id.* ¶¶ 30–32]. Around the same time, defendant published his songs to a public Facebook group, believed to include track and field recruits and their families [*Id.* ¶ 33].

In early-to-mid March 2025, plaintiff asserts that defendant released three additional songs on Apple Music and Spotify [*Id.* ¶ 34]. One of these songs, plaintiff claims, targeted plaintiff with false and disparaging allegations of scandal and fraud [*Id.*]. Defendant later sent plaintiff a text message with an audio copy of such song and noted that he hoped the song would not "throw off the game plan too much[,]" appearing to refer to an upcoming track and field championship of which plaintiff's team would participate [*Id.* ¶ 35]. On March 13, 2025, plaintiff asserts that defendant released a nine-track album with most of the songs directed at plaintiff [*Id.* ¶ 36]. Plaintiff claims that many of these songs contain untruthful, derogatory, and offensive statements about him, including allegations of the use of performance-enhancement drugs by plaintiff and his son, claims that plaintiff runs a "dirty program" at UT, and accusations of infidelity on the part of plaintiff [*Id.*]. This album, plaintiff alleges, caught the attention of various social media personalities who published stories about defendant's music on various mediums, including X (formerly Twitter) [*Id.* ¶ 37].

At or around the same time of defendant's album release, plaintiff asserts that defendant began spreading rumors that plaintiff, who is married with three children, had

an affair with an assistant coach and fathered a daughter with said coach [*Id.* ¶ 38]. Plaintiff claims that, in an attempt to harass him, defendant posted on his Instagram and Facebook accounts multiple photographs of plaintiff's three children and the assistant coach's daughter which were generated or doctored by artificial intelligence ("AI") [*Id.* ¶ 39]. Specifically, the face of the assistant coach's daughter was modified to make it appear to be plaintiff's face [*Id.*]. In June 2025, defendant allegedly released another song on Apple Music and Spotify which insinuated that a paternity test was needed to determine if plaintiff was the father of the assistant coach's daughter [*Id.* ¶ 40].

After being silent for several months, plaintiff alleges that defendant resurfaced on November 12, 2025, by texting plaintiff and criticizing his signing of a new track and field recruit [*Id.* ¶ 41]. Attached to this text message, plaintiff claims, was a link to a fake interview video, published to Instagram and Facebook, in which defendant harshly criticizes the competence of Devin West, the Recruitment Coordinator who replaced defendant [*Id.*].

Plaintiff claims that on December 5, 2025, the beginning of the college transfer portal window, defendant "dramatically ramped up his malicious campaign of harassment and disparagement against" plaintiff [*Id.* ¶ 42]. First, plaintiff alleges that defendant sent a "defamatory and wildly inappropriate email" to hundreds of individuals in the collegiate track and field community, including members of UT's athletic department as well as members of other university's athletic departments [*Id.* ¶ 43 (citing *id.* at 29–38)]. This email included a fictional script ridiculing plaintiff as well as links to over 50 songs recorded by defendant and released on Apple Music and Spotify [*Id.*]. Plaintiff asserts that

most of these songs target him and are intended to defame, demean, and humiliate him [*Id.* ¶ 44]. That same day, defendant allegedly posted a video on Instagram and Facebook of a fake newscast regarding the BALCO[2] steroid doping scandal from the early 2000s and its purported connection to UT's Track and Field program under plaintiff [*Id.* ¶ 45].

Between December 12 and 25, 2025, defendant purportedly posted more than 20 videos on Instagram and Facebook attacking plaintiff's character with "blatantly false allegations of wrongdoing" and "highly offensive and demeaning fake [AI] videos" [*Id.* ¶ 46]. For example, plaintiff claims that defendant created a fake, sexually suggestive video depicting plaintiff with Sean "Diddy" Combs [*Id.* ¶ 47]. Similarly, defendant allegedly posted another fake, AI-generated video depicting plaintiff in prison with Combs and Sherrone Moore, a disgraced former university football coach [*Id.* ¶ 48]. In one of these videos, plaintiff asserts that defendant made it clear that he was intentionally targeting plaintiff by referring to plaintiff by name [*Id.* ¶ 49]. In another video, defendant allegedly gloated that "his ongoing propaganda and online 'content' [was] negatively affecting" plaintiff's ability to attract track and field recruits to UT [*Id.*].

On January 2, 2026, defendant purportedly posed another AI-generated video in which he bragged about mentally torturing and abusing plaintiff for months [*Id.* ¶ 50]. A few days later, defendant posted another fake interview on Instagram and Facebook in which he again accused plaintiff of infidelity and impregnating his former assistant coach

[2] BALCO appears to refer to the Bay Area Laboratory Co-operative. *Bay Area Laboratory Co-operative*, WIKIPEDIA, https://en.wikipedia.org/wiki/Bay_Area_Laboratory_Co-operative [https://perma.cc/WX49-YKTR] (last visited Sept. 12, 2026).

[*Id.* ¶ 51]. Finally, plaintiff claims that on January 6, 2026, just a few days before UT's initial 2026 track and field meet, defendant sent plaintiff a text message, boasting that his campaign of defamation and cyber-harassment likely prevented plaintiff from signing the top high school track recruit to UT [*Id.* ¶ 52]. Plaintiff alleges that the text message also contained audio copies of two new songs from defendant, both of which defame plaintiff and various UT athletes [*Id.*].

Plaintiff submits that his reputation has been greatly damaged by defendant's conduct, which plaintiff believes will continue indefinitely [*Id.* ¶¶ 53–54]. Accordingly, plaintiff asserts that he had no other option to initiate the instant action, bringing claims of defamation and false light invasion of privacy against defendant [*Id.* ¶¶ 55–68].

## II. Motion to Dismiss for Lack of Personal Jurisdiction – Rule 12(b)(2)

### A. Standard of Review

Plaintiff bears the burden of establishing the Court's personal jurisdiction over defendant. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). The Court deems it unnecessary to conduct an evidentiary hearing on the issue of personal jurisdiction. Accordingly, the Court must consider the pleadings and affidavits in a light most favorable to plaintiff, and dismissal under Rule 12(b)(2) is "proper only if all the specific facts which [plaintiff] alleges collectively fail to state a prima facie case for jurisdiction." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996); *accord Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008) (citation and internal quotation marks omitted) (stating when the district

court relies solely on written submissions and affidavits to resolve a Rule 12(b)(2) challenge, "the plaintiff's burden is relatively slight").

However, the Court need not "ignore undisputed factual representations of the defendant which are consistent with the representations of the plaintiff." *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 153 (6th Cir. 1997). And, once a defendant submits "affirmative evidence showing that the court lack[s] jurisdiction, mere allegations of jurisdiction are not enough"; rather, a plaintiff must "set forth, by affidavit or otherwise, specific facts showing jurisdiction." *Parker v. Winwood*, 938 F.3d 833, 839–40 (6th Cir. 2019).

"A federal court may only exercise personal jurisdiction in a diversity case if such jurisdiction is (1) authorized by the law of the state in which the court sits; and (2) is otherwise consistent with the Due Process Clause of the Fourteenth Amendment." *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003). Where the state long-arm statute extends to the limits of the due process clause, "the two inquiries are merged and the court need only determine whether exercising personal jurisdiction violates constitutional due process." *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 477 (6th Cir. 2003). Because Tennessee's long-arm statute "has been interpreted as coterminous" with the limits of the due process clause, *id.* (internal citation omitted), the Court considers whether exercising personal jurisdiction over defendant would violate due process.

A court may exercise personal jurisdiction over a defendant on the basis of general jurisdiction or specific jurisdiction. *Youn*, 324 F.3d at 417 (first citing *Burger King v. Rudzewicz*, 471 U.S. 462, 472 (1985); and then citing *Conti v. Pneumatic Prods. Corp.*,

977 F.2d 978, 981 (6th Cir. 1992)). "A federal court has general jurisdiction when the defendant's contacts with the forum state are 'substantial' and 'continuous and systematic,' so that the state may exercise personal jurisdiction over the defendant even if the action does not relate to the defendant's contacts with the state." *Id.* at 417–18. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Goodyear Dunlap Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

A court may exercise specific jurisdiction over a defendant "in a suit arising out of or related to the defendant's contacts with the forum." *Conti*, 977 F.2d at 981 (6th Cir. 1992). The Sixth Circuit applies a three-part test, often termed the *Mohasco* test, for determining whether an exercise of specific jurisdiction falls within constitutional limits: (1) "the defendant must purposefully avail himself of the privilege of acting in the forum state"; (2) "the cause of action must arise from the defendant's activities there"; and (3) "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968); *accord Conti*, 977 F.2d at 981. "Each part of the *Mohasco* test represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked." *AMB Media, LLC v. OneMB, LLC*, No. 23-5607, 2024 WL 2052151, at *3 (6th Cir. May 8, 2024) (internal quotation marks omitted) (quoting *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1303 (6th Cir. 1989)).

### B. Analysis

Defendant argues that this Court does not have personal jurisdiction over him as he is a non-resident, and his relevant conduct in this case is merely "internet speech that was created outside [of] Tennessee, not directed at Tennessee, and not aimed at any Tennessee-specific audience" [Doc. 17, p. 1]. As to his last point, defendant stresses that the content at issue was published to his own "limited social media audience" which is "self-selected[ and] geographically diffuse" [*Id.* at 2].

In response, plaintiff contends that the Court has specific jurisdiction over defendant because defendant "intentionally directed his communications and social media posts to citizens of Tennessee and the present litigation arises out of injuries to [plaintiff] caused, in part, by [defendant's] activities in Tennessee" [Doc. 27, pp. 1–2]. In more detail, plaintiff asserts that defendant purposefully availed himself to Tennessee because his "unilateral and voluntary actions clearly and unequivocally connect him to this forum[,]" citing to, amongst other conduct, defendant's demand letter to UT's Office of General Counsel, defendant's December 5, 2025, email which was sent directly to plaintiff and numerous employees of UT's athletic department, and defendant's production of AI videos depicting Tennessee residents with an intended audience of Tennessee inhabitants [*Id.* at 15–16]. Next, plaintiff argues that his claims arise, in part, out of defendant's communications to Tennessee residents concerning plaintiff's activities in Tennessee [*Id.* at 17]. Moreover, defendant's online activities were directed at Tennessee and intended to cause serious reputational harm to plaintiff whose resides in and is employed in Tennessee [*Id.*]. Finally, plaintiff insists that it is reasonable for defendant to be subject to jurisdiction in Tennessee

given his activities, as mentioned previously, and the State of Tennessee's marked interest in the parties' dispute [*Id.* at 17–18].

Defendant replies, arguing that the dispute here merely "reflects disagreement over characterization of past events already in the public domain" which does implicate Tennessee as a focal point of any tort [Doc. 28, p. 5]. Relatedly, defendant submits that plaintiff, in his opposition, does not "identify [any] conduct expressly aimed at Tennessee as a forum[,]" particularly given that defendant's online speech is accessible nationwide [*Id.* at 6]. Finally, defendant asserts that reputational harm "allegedly felt in Tennessee" is an insufficient basis for personal jurisdiction over him [*Id.* at 5].

**1. Purposeful Availment**

Turning to the first part of the *Mohasco* test,[3] purposeful availment "is present where the defendant's contacts with the forum state proximately result from the actions by the defendant *himself* that create a substantial connection with the forum State . . . ." *Neogen Corp.*, 282 F.3d at 889 (internal quotation marks omitted) (emphasis in original) (quoting *Burger King Corp.*, 471 U.S. at 475). The requirement of purposeful availment "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous or attenuated contacts of the unilateral activity of another party or third person." *Air Prods. & Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) (internal quotation marks omitted) (quoting *Burger King Corp.*, 471 U.S. at 475). Though "a defendant's contacts with the forum State may be intertwined with his transactions or

[3] Given plaintiff only asserts that there is specific personal jurisdiction, the Court need not address general personal jurisdiction.

interactions with the plaintiff or other parties[,]" "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (citation omitted).

The Court ultimately finds that purposeful availment is established here. Two cases are instructive. In *Blessing v. Chandrasekhar*, 988 F.3d 889 (6th Cir. 2021), the Sixth Circuit affirmed that the district court in Kentucky did not have personal jurisdiction over the defendant Kathy Griffin, a California celebrity. *Id.* at 907. Griffin had posted a series of tweets about an incident involving Kentucky students who had participated in a rally in Washington, D.C. *Id.* at 893. The students filed a lawsuit in the Eastern District of Kentucky, and Griffin moved to dismiss for lack of personal jurisdiction. *Id*. The Sixth Circuit found that exercising personal jurisdiction violated due process, noting in part that Griffin did not have "any preexisting relationship with plaintiffs, business or otherwise[,]" and that she did not take any "affirmative steps to direct any communications to the plaintiffs or to anyone else in Kentucky." *Id.* at 906.

On the other hand, in *Johnson v. Griffin*, 85 F.4th 429 (6th Cir. 2023) the Sixth Circuit found that the Middle District of Tennessee had personal jurisdiction over Griffin for her tweets. *Id.* at 434–45. In that case, Griffin "sent a series of tweets to her two million Twitter followers asserting that Tennessean Samuel Johnson, the CEO of Tennessee-based VisuWell, had engaged in homophobic conduct." *Id.* at 431. Griffin argued that the court did not have jurisdiction because "she disseminated these tweets generally to her two million followers, and mere knowledge that some Tennessee residents would read them does not suffice to establish personal jurisdiction." *Id.* at 435 (citation omitted).

Ultimately, the *Johnson* court disagreed, finding that her tagging of the Tennessee company in her tweet and her follow-up tweets to remove the CEO "amounted to direct communications with the Tennessee company." *Id.*

Here, the parties do not dispute that defendant's employment ceased in Tennessee [*See* Doc. 44 ¶ 22]. *Cf. Blessing*, 988 F.3d at 906 (stating that Griffin did not have "any preexisting relationships with the plaintiffs, business or otherwise"). Generally, and as a result, defendant sent various correspondences to individuals employed at UT, sent various text messages directly to plaintiff, posted videos online about plaintiff, and created music about plaintiff [*Id.* ¶¶ 24–52]. As the Sixth Circuit has noted, other circuits "have routinely held that 'posting allegedly defamatory comments or information on an internet site does not, without more, subject the poster to personal jurisdiction wherever the posting could be read (and the subject of the posting may reside).'" *Blessing*, 988 F.3d at 905 n.15 (quoting *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011)). But here, defendant's activity went beyond posting content on social media.

First, and as previously mentioned, defendant sent a demand letter directly to UT's Office of General Counsel on May 30, 2024 [*See* Doc. 44 ¶¶ 24–27; *id.* at 25–27]. *See Johnson*, 85 F.4th at 434 ("In *Blessing*, Griffin never communicated with the Kentucky school."). And even if the demand letter was "private" per se, "one cannot avoid personal jurisdiction by putting the [alleged] tortious missive in a private letter[.]" *Id.* (citation omitted); *accord Dorn v. Dominique*, Nos. 22-5620/5682, 2023 WL 2543714, at *5–6 (6th Cir. Mar. 14, 2023) (holding that out-of-state phone calls defaming Kentucky musician's

agent sufficed to establish personal jurisdiction in Kentucky over the agent's tortious interference claim).

In addition, defendant sent text messages and email communications directly to plaintiff and included links to his songs [*Id.* ¶¶ 35, 41, 52; *id.* at 29–38]. *See Blessing*, 988 F.3d at 905 (citations omitted) ("The Sixth Circuit cases on which the plaintiffs rely all involved out-of-state defendants who had sent numerous tortious communications directly to plaintiffs in the forum state, and every case involved a pre-existing business relationship."); *see also Power Investments, LLC, v. SL EC, LLC*, 927 F.3d 914, 919 (6th Cir. 2019) (holding that Kentucky could exercise jurisdiction over the nonresident defendant who initiated the relationship with the Kentucky citizen and communicated with him "for well over a year"); *cf. Blessing*, 988 F.3d at 906 (noting that Griffin did not take any "affirmative steps to direct any communications to the plaintiffs").

Further, on December 5, 2025, defendant sent an email to various individuals at UT, including plaintiff, with the subject line, "Dwanye Ross Saga[](Happy Birthday Champ)" [*Id.* ¶¶ 43–44; *see id.* at 29–32]. On the same day, defendant posted a video on his social media about the BALCO steroid doping scandal and its purported connection to UT's track and field program under plaintiff [*Id.* ¶ 45]. Such video includes a photograph of a UT athlete in his track and field uniform [*Id.*]. *See Druskinis v. StopAntisemitism*, 766 F. Supp. 3d 723, 734 (E.D. Mich. 2024) ("[B]y tagging Michigan Hockey in a post about the Michigan activities of a Michigan resident, [the defendant] intentionally directed its allegedly tortious conduct at the forum."). A month later, on January 5, 2026, defendant posted an AI-generated interview, wherein he discussed "that whole Tennessee situation"

[*Id.* ¶ 51; *id.* at 18 n.8]. *See Johnson*, 85 F.4th at 433 (noting that Griffin's emphasis on the plaintiff's residence and the company's home base showed that "she 'undoubtedly knew' that the 'focal point' of her tweets concerned Tennessee" (quoting *Air Prods. & Controls, Inc.*, 503 F.3d at 553)); *see also Blessing*, 988 F.3d at 906 (explaining that the defendant "must create contacts with the forum State" (quoting *Walden*, 571 U.S. at 291)).

In light of defendant's direct communications with UT, his direct communications with plaintiff, his content relating to plaintiff and plaintiff's job at UT, the Court finds that defendant has purposefully availed himself of this forum. *See Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) (providing that the act of sending communications into the forum "may be sufficient to confer jurisdiction on the foreign defendant" where the communications form the bases for the action); *Johnson*, 85 F.4th at 435 ("That conclusion would hold even if [Griffin] had called only on non-Tennesseans to engage in her campaign." (citation omitted)).[4]

### 2. Arising from Defendant's Activities

The second prong of *Mohasco* is satisfied "if a defendant's contacts with the forum state are related to the operative facts of the controversy." *CompuServe, Inc.*, 89 F.3d at 1262. "Only when the operative facts of the controversy are not related to the defendant's

[4] The Court also considers that plaintiff's professional reputation is centered in Tennessee, a fact of which defendant was undoubtedly aware. Moreover, defendant was certainly aware that his alleged conduct, such as the letter he sent to UT's general counsel, would potentially jeopardize plaintiff's career in Tennessee. These particulars only strengthen the finding that the focal point of damage in this case was Tennessee, and defendant was aware of the potential that plaintiff would be damaged there. *See Koch v. Local 438, United Autoworkers Union*, 54 F. App'x 807, 811–12; *see generally Calder v. Jones*, 465 U.S. 783, 789 (1984) (establishing that the effects of intentional torts may establish personal jurisdiction).

contact with the state can it be said that the cause of action does not arise from that contact." *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723–24 (6th Cir. 2000). This prong "does not require that the cause of action formally 'arise from' defendant's contacts with the forum" but "only 'that the cause of action . . . *have a substantial connection* with the defendant's in-state activities.'" *Third Nat. Bank in Nashville v. WEDGE Grp. Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989) (emphasis in original) (quoting *Mohasco Indus., Inc.*, 401 F.2d at 384 n.27).

Considering and incorporating the analysis set forth above, defendant's contacts with Tennessee are related to the operative facts of the controversy here. Plaintiff's causes of action, defamation and false light invasion of privacy, arise, at least in part, from the communications defendant directed into Tennessee. *See Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002) (noting that the "arising from" factor of the *Mohasco* test is a "lenient standard"). For example, plaintiff alleges that the demand letter sent by defendant to UT's Office of General Counsel contained numerous "patently false and inflammatory allegations" against plaintiff, including claims of use of performance-enhancing drugs [*See* Doc. 44 ¶¶ 24–26]. As another example, plaintiff alleges that defendant posted a fake social media video, which contained a photo of a UT athlete, discussing UT's track and field program under plaintiff and its supposed relation to a steroid doping scandal [*Id.* ¶ 45]. Moreover, defendant's actions in general are alleged to have been conducted with the purpose of demolishing plaintiff's personal and professional reputation, which defendant is aware lie in Tennessee [*Id.* ¶¶ 2, 11–12, 19–20, 54]. Bearing all this in mind, plaintiff has met his *prima facie* burden as it relates to the second prong of the *Mohasco* test.

### 3. Reasonableness

The final part of the *Mohasco* test is that "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." 401 F.2d at 381. The purpose of the final *Mohasco* factor is to ensure "that the exercise of personal jurisdiction is consistent with notions of 'fair play and substantial justice.'" *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 903 (6th Cir. 2017) (quoting *Burger King Corp.*, 471 U.S. at 476–77). "When the first two prongs of [the] personal jurisdiction test are met, there is an inference of reasonableness and 'only the unusual case will not meet this third criteria.'" *Id.* at 903–04 (quoting *Air Prods. & Controls, Inc.*, 503 F.3d at 554). The Supreme Court has held that the reasonableness analysis is a function of three factors: "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi Metal Indus., Co. v. Superior Ct. of Cal.,* 480 U.S. 102, 113 (1987).

These factors weigh in favor of exercising personal jurisdiction over defendant. First, the burden on defendant is insufficient to overcome the inference of reasonableness. While defendant lives in Maryland, the fact that he may have to travel to Tennessee does not render the exercise of jurisdiction unreasonable. *See AlixPartners, LLP v. Brewington*, 836 F.3d 543, 552 (6th Cir. 2016) (finding personal jurisdiction reasonable in Michigan despite the defendant living in Texas because the defendant deliberately affiliated himself with residents of Michigan). And defendant has not expressed any burden in defending the present action in Tennessee. Next, the Court finds that Tennessee has a strong interest in adjudicating controversies involving its residents harmed within its bounds. *See MAG*

*IAS Holdings, Inc.*, 854 F.3d at 904 (finding Michigan, the forum state, to have an interest in the litigation because the defendant allegedly caused harm to a Michigan business, which also impacted Michigan-based employees). Lastly, the Court concludes that plaintiff certainly has an interest in pursuing his claims and obtaining relief. Accordingly, the Court finds that plaintiff has met his burden in establishing the third and final *Mohasco* prong, affirming the exercise of personal jurisdiction of this Court over defendant. In turn, defendant's motion to dismiss this action is **DENIED** to the extent it asserts a lack of personal jurisdiction under Rule 12(b)(2) [Doc. 17].

## III. Motion to Dismiss for Improper Venue – Rule 12(b)(3)

### A. Standard of Review

A federal plaintiff "bears the burden of proving that venue is proper." *Audi AG & Volkswagen of Am., Inc. v. Izumi*, 204 F. Supp. 2d 1014, 1017 (E.D. Mich. 2002); *accord Tobien v. Nationwide Gen. Ins. Co.*, 133 F.4th 613, 619 (6th Cir. 2025) ("[W]hen a defendant challenges the venue, the plaintiff bears the burden of proving venue by a preponderance of the evidence."). In considering a Rule 12(b)(3) motion to dismiss for improper venue, the Court "may examine facts outside of the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." *Izumi*, 204 F. Supp. 2d at 1017. If the Court concludes that venue is not proper in this judicial district, the Court has the discretion to dismiss or transfer the case pursuant to 28 U.S.C. § 1406(a). *Id.*

### B. Analysis

Defendant argues that venue is improper in Tennessee as the complaint does not allege that he resides in Tennessee, "nor does it allege that a substantial part of the events or omissions giving rise to [p]laintiff's claims occurred in Tennessee" [Doc. 17, p. 3]. Rather, defendant asserts, the challenged content in this case was created "outside [of] Tennessee and distributed through national internet platforms untethered to any particular state" [*Id.*].

Plaintiff responds, arguing that a substantial part of the events giving rise to his claims occurred in Knoxville, Tennessee [Doc. 27, p. 18 (citing 28 U.S.C. § 1391(b)(2))]. Specifically, plaintiff submits that his claims arise out of "certain written and electronic communications that were personally sent by [defendant] to various third-parties located in Knoxville[,]" and defendant's "online activity and social media posts" which were directed at individuals located in Knoxville [*Id.* at 19]. And defendant's communications and posts relate to plaintiff's activities in Knoxville and caused plaintiff harm in Knoxville [*Id.*].

"Venue is '[t]he proper or a possible place for a lawsuit to proceed, [usually] because the place has some connection either with the events that gave rise to the lawsuit or with the plaintiff or defendant.'" *Tobien*, 133 F.4th at 618 (alterations in original) (quoting *Venue*, Black's Law Dictionary (12th ed. 2024)). Under 28 U.S.C. § 1391(b), the plaintiff may "sue in three places: where a defendant resides, where a substantial part of the events happened, or if neither of those works, wherever personal jurisdiction is available." *Id.*

As to the second of these places, "[s]ubstantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute." *Capitol Specialty Ins. Corp. v. Splash Dogs, LLC*, 801 F. Supp. 2d 657, 672 (S.D. Ohio 2011) (citations omitted) (internal quotation marks omitted). In determining whether there is a sufficiently substantial connection to the judicial district, "courts focus their inquiry on the defendant's relevant activities." *Id.* (citation omitted). For the same reasons personal jurisdiction exists, the Court finds that venue is proper in the State of Tennessee and more specifically, in the Eastern District of Tennessee, wherein plaintiff resides. 28 U.S.C. § 1391(b)(2), (b)(3). Accordingly, defendant's motion to dismiss this action is **DENIED** to the extent it asserts improper venue under Rule 12(b)(3) [Doc. 17].

## IV. Motion to Dismiss for Failure to State a Claim – Rule 12(b)(6)

### A. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must first comply with Rule 8(a)(2) which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "Although this standard does not require 'detailed factual allegations,' it does require more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Specifically, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This requires "more than a sheer

possibility that a defendant has acted unlawfully." *Id.* A complaint that pleads facts "merely consistent with" liability, "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Finally, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

In reviewing a motion to dismiss under Rule 12(b)(6), the Court "must construe the complaint in a light most favorable to plaintiffs, accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008). However, the Court need not accept legal conclusions or unwarranted factual inferences as true. *Montgomery v. Huntington Bank*, 346 F.3d 693, 698 (6th Cir. 2003) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

### B. Defamation

Defendant asserts that plaintiff fails to assert a claim for defamation because he does not identify the alleged defamatory statements with the specificity required [Doc. 17, p. 3]. Instead, defendant argues, plaintiff merely relies on "generalized labels" such as "smear campaign," which are conclusory rather than factual allegations [*Id.* at 3–4]. Defendant also contends, to the extent plaintiff could be characterized as a limited-purpose public figure,

that plaintiff fails to plead that any statement was made with "actual malice," that is, with knowledge of its falsity or with reckless disregard for its truth [*Id.* at 4].

In response, plaintiff submits that defendant's former argument is "simply incorrect" as the complaint outlines defendant's tortious conduct in considerable detail, identifying the "defamatory materials and libelous statements by date, method of publication, and substance" as well as attaching exhibits of pertinent communications and including hyperlinks to various online posts [Doc. 27, p. 21]. As to defendant's assertion that he is a limited-purpose public figure, plaintiff contends that the question of whether he can be considered a "public figure" and whether defendant acted with "actual malice" are issues for the trier of fact to decide [*Id.* at 20 n.56]. But, to the extent the Court considers such argument for purposes of defendant's motion, plaintiff submits that his complaint clearly establishes that defendant's actions were done with malice and "are thus sufficient to state a claim for defamation against a public figure" [*Id.*].

Defendant asserts in reply that plaintiff fails to bear his burden of demonstrating the clear falsity of defendant's statements [Doc. 28, pp. 1–3]. Defendant describes his statements, as alleged by plaintiff, to be reference, commentary, or characterizations of "publicly documented events" or "controversy" [*Id.* at 2]. And while plaintiff may offer "competing characterizations" to defendant's statements, defendant contends that this does not meet the requirement of verifiable, clear falsity [*Id.*]. Defendant further submits that the alleged defamatory statements within his songs cannot be viewed in isolation; rather, they must be viewed in context [*Id.* at 3]. Doing so, defendant states, shows that his songs do not state that plaintiff "personally used performance-enhancing drugs, nor do they allege

present-tense misconduct" at UT [*Id.*]. As to the AI-generated content at issue, defendant avers that such content was "accompanied by commentary referencing the artificial . . . nature of the content" [*Id.* at 4]. Moreover, the AI-generated content "did not attribute specific statements to [p]laintiff" and "did not allege particular misconduct" [*Id.*]. Finally, despite his original indecision as to plaintiff's societal position, defendant argues readily in his reply that plaintiff is a limited-purpose public figure who has not alleged actual malice in his complaint [*Id.*]

"To state a defamation claim under Tennessee law, a plaintiff must allege that '(1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.'" *Clayton v. Hogan*, 753 F. Supp. 3d 629, 637 (M.D. Tenn. 2024) (quoting *Sullivan v. Baptist Mem'l Hosp*., 995 S.W.2d 569, 571 (Tenn. 1999)).[5] "'Publication' is a term of art meaning the communication of defamatory matter to a third person." *Sullivan*, 995 S.W.2d at 571 (citing *Quality Auto Parts Co., Inc. v. Bluff City Buick Co.*, 876 S.W.2d 818, 821 (Tenn. 1994)).

[5] "A federal court sitting in diversity must apply the choice-of-law rules of the forum state." *Stone Surgical, LLC v. Stryker Corp.*, 858 F. 3d 383, 389 (6th Cir. 2017) (citation omitted). "When determining choice-of-law questions, Tennessee follow the 'most significant relationship' approach, which applies 'the law of the state where the injury occurred . . . unless some other state has a more significant relationship to the litigation.'" *Cedeno v. Upchurch*, No. 3:23-CV-876, 2024 WL 3609079, at *2 (M.D. Tenn. July 30, 2024) (quoting *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)). "[G]enerally the law of the state where the injury occurred will have the most significant relationship to the litigation." *Hataway*, 830 S.W.2d at 59. Here, the Court finds, and it appears that the parties do not dispute, that Tennessee has the most significant relationship to the action at hand. Accordingly, the Court will apply Tennessee law here.

"The question of whether a statement was understood in a defamatory sense generally is a question of fact for the trier of fact." *Aegis Scis. Corp. v. Zelenik*, No. M2012-898-COA-R3CV, 2013 WL 175807, at *6 (Tenn. Ct. App. Jan. 16, 2013) (citation omitted). "However, the preliminary question of whether a statement 'is capable of conveying a defamatory meaning' presents a question of law[,]" meaning it is to be determined by the court. *Id.* (quoting *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000)).

"A statement is defamatory if it 'constitute[s] a serious threat to the plaintiff's reputation.'" *Finney v. Jefferson*, No. M2019-00326-COA-R3-CV, 2020 WL 5666698, at *3 (Tenn. Ct. App. Sept. 23, 2020) (quoting *Revis*, 31 S.W.3d at 252–53); *accord Am. Addiction Ctrs., Inc. v. Nat'l Ass'n of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 842 n.17 (M.D. Tenn. 2021). A statement is not defamatory "simply because [the plaintiff] finds the publication annoying, offensive, or embarrassing." *Revis*, 31 S.W.3d at 253 (citation omitted); *accord Davis v. Covenant Presbyterian Church of Nashville*, No. M2014-02400-COA-R9-CV, 2015 WL 5766685, at *3 (Tenn. Ct. App. Sept. 30, 2015). Rather, the statement "must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule." *Revis*, 31 S.W.3d at 253. In other words, the statement must "tend[ ] so to harm the reputation of another as to lower him . . . in the estimation of the community or to deter third persons from associating or dealing with him[.]" *Grant v. Com. Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *9 (Tenn. Ct. App. Sept. 18, 2015) (internal quotation marks omitted) (quoting *Aegis Scis. Corp.*, 2013 WL 175807, at *5).

In determining whether a statement is defamatory for purposes of a motion to dismiss, the Tennessee Court of Appeals has observed that such statement

> must be judged within the context it is made. . . . Additionally, it "should be read as a person of ordinary intelligence would understand [it] in light of the surrounding circumstances.". . . To this end, courts are not bound to the plaintiff's interpretation of the allegedly defamatory material, and if the words "do not reasonably have the meaning plaintiff ascribes to them, the court must disregard" plaintiff's interpretation.

*Grant*, 2015 WL 5772524, at *10 (internal citations omitted). In essence, "[i]n making the determination of whether a communication is capable of being understood as defamatory, '[t]he courts of this state have consistently followed the prevailing common-law practice of construing the allegedly libelous words in their "plain and natural" import.'" *McWhorter v. Barre*, 132 S.W.3d 354, 365 (Tenn. Ct. App. 2003) (quoting *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 419 n.7 (Tenn. 1978)).

**1. Publication**

As an initial matter, the Court would note that several of plaintiff's factual allegations relate to text messages sent by defendant directly to plaintiff [Doc. 44 ¶¶ 35, 41, 52]. While it is unclear whether plaintiff alleges that these text messages themselves are "defamatory," the Court, in an abundance of caution, would note that these text messages do meet the "publication" element of a defamation claim such that they were not published to a third party. *Clayton*, 753 F. Supp. 3d at 637; *Sullivan*, 995 S.W.2d at 571. However, the Court still considers the content of these messages to the extent they relate to defendant's publicly-available content [*See, e.g.*, Doc. 44 ¶ 52 (alleging that defendant sent plaintiff a text which included "audio copies of two newly published songs")].

It appears undisputed by the parties that the remainder of plaintiff's alleged defamatory statements [*see id.* ¶¶ 25–26, 30–32, 34, 36, 38–40, 43–48, 51–52] were published to third parties, and the Court finds the same.

**2. Actual Malice**

Before turning to whether the statements by defendant can be capable of conveying defamatory meaning, the Court finds it appropriate to address defendant's arguments, one explicit and one implicit, that implicate the need for plaintiff to plead "actual malice" in his complaint.

First, and as noted previously, defendant alleges that, despite plaintiff being a "limited-purpose public figure," he has not alleged "actual malice" in his complaint [Doc. 17, p. 4; Doc. 28, p. 4]. "If the plaintiff in a defamation case is a public official or public figure, he or she must also prove that the libelous statement was made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Am. Addiction Ctrs., Inc.*, 515 F. Supp. 3d at 834 (citations omitted). "With respect to a claim of defamation subject to the "actual malice" standard, 'a complaint [is] sufficient if it alleges that [defendants] made public statements that they knew were false . . . while knowing or recklessly disregarding their falsehood.'" *Id.* at 835 (quoting *Wigington v. Metro. Nashville Airport Auth.*, 374 F. Supp. 3d 681, 690 (M.D. Tenn. 2019)).

Second, defendant characterizes his alleged statements as mere commentary on "publicly documented events" or "controversy" [Doc. 28, p. 2]. If speech in question addresses matters of public concern "a plaintiff must show that the speaker 'acted with actual malice.'" *Church of God in Christ, Inc., Bd. of Dirs. v. Tyson*, No. 2:25-CV-3029,

2026 WL 2256336, at *5 (W.D. Tenn. Aug. 5, 2026) (quoting *Charles v. McQueen*, 693 S.W.3d 262, 280 (Tenn. 2024)).

The Court need not determine at this time whether plaintiff was a "public figure" when the alleged defamatory statements were made or determine whether the statements addressed a matter of public concern because plaintiff has sufficiently alleged that defendant acted with malice [Doc. 44 ¶ 57 ("Defendant . . . has and continues to create, distribute, and/or otherwise publish untrue and disparaging statements about [plaintiff] with knowledge that such statements are false."); *see id.* ¶ 3 ("Defendant . . . has used a wide range of mediums . . . to intentionally spread false and repugnant information about [plaintiff]."); *id.* ¶ 61 ("Defendant['s] . . . conduct of distributing defamatory statements, communications, songs, and videos was done maliciously . . . ."); *see also id.* ¶¶ 5–6, 8, 10, 12, 25–26, 29, 34, 46, 58, 64–65). Accordingly, any argument that plaintiff fails to plead actual malice is meritless.

### 3. Understood in a Defamatory Sense

Now the Court turns to whether the statements made by defendant can be understood in a defamatory sense. The Court begins with the statements made in the demand letter defendant sent to UT's Office of General Counsel [*See* Doc. 44 ¶¶ 25–26; *id.* at 25–27]. In that letter, defendant, in relevant part, wrote:

> Duane Ross has a documented history of questionable behavior. He received a two-year suspension from the U.S. Anti-Doping Agency for using performance-enhancing drugs . . . . His involvement in the BALCO steroid case further underscores his troubled past.
>
> . . .

> His son . . . has also been suspended for doping violations. . . . Where do you think he learned that from?
>
> . . .
>
> Under Duane Ross's leadership, North Carolina A&T faced multiple suspensions of top athletes for doping violations. . . . These incidents . . . are closely tied to him and paint a picture of ongoing integrity issues.

[*Id.* at 26 (emphasis omitted)]. The Court finds that these statements can be understood in a defamatory manner. The first set of statements in particular are "capable of defamatory meaning because they can reasonably be interpreted as conveying actual facts" about plaintiff. *Armstrong v. Shirvell*, 596 F. App'x 433, 442 (6th Cir. 2015); *accord Church of God in Christ, Inc.*, 2026 WL 2256336, at *4 (finding the alleged statements in question were capable of defamatory meaning in part because such statements, asserting fraud, theft, perjury, and elder abuse, were "objectively verifiable"). Moreover, the overall context in which these statements were made, i.e., in a demand letter to a university titled "Settlement Negotiation Regarding Wrongful Termination and Discrimination," makes it even more certain that "a reasonable person could interpret them as conveying actual facts." *Armstrong*, 596 F. App'x at 442 (stating that the defendant "made it abundantly clear that he wanted others to interpret the statements . . . as actual facts").

As to the latter two sets of statements, when read in conjunction with the former set of statements, they imply that plaintiff has coached his son and his student-athletes to use performance-enhancing drugs as well. *See Malmquist v. Hearst Corp.*, No. 2:09-CV-2416, 2010 WL 1257800, at *3 (W.D. Tenn. Mar. 26, 2010) ("Reading these details so narrowly ignores the overall effect of the article, which implies that [p]laintiff is an

emotionally-abusive spouse."). And to that point, all of defendant's words here undoubtedly carry with them "an element of disgrace" and hold plaintiff "up to public hatred, contempt, and ridicule" as they allege the illicit use of performance-enhancing drugs in athletics, implying cheating and deceit, and condemnation from a national organization. *Am. Addiction Ctrs., Inc.*, 515 F. Supp. 3d at 842 n.17 (citing *Davis*, 2015 WL 5766685, at *3); *accord id.* at 844 ("Accusing someone of engaging in deceptive practices and being dishonest could . . . hold someone up to not just disapproval and remonstration, but also to hatred, contempt, and ridicule."). Additionally, these words readily suggest the "passing on" of these dishonest practices from plaintiff to his own son as well as the teams he coaches. *Id.* at 844. Accordingly, these statements can be understood in a defamatory sense.

Next, the Court turns to the first two songs plaintiff alleges have defamatory lyrics [Doc. 44 ¶¶ 30–32]. First, as to the song "Vault Talk," plaintiff asserts that these lyrics include allegations of drug use by him and his student-athletes:

> You coached the swift, but shortcuts were taken.
> Foundations cracked with every rule you'd forsaken.
> From hurdles's heights to the oval's bend.
> The façade crumbles as the investigation begins.
>
> Vault talk, unlocking the hidden sins.
> The race is over before it begins.
> Claims you built your legacies on blood and sweat
> But it[']s P.E.D dreams, don't forget the debt.
>
> Whispers of Tokyo, stories in Eugene,
> Fast lanes, slow truths y'all know what I mean?
> Trophies shine less when the stains appear
> Fake crowns crumble when the end is near.

[*Id.* ¶ 31].[6] As emphasized by defendant [*see* Doc. 28, p. 3], the Court recognizes and considers the context in which defendant made his allegedly defamatory statements—through song. *See Kersey v. Wilson*, No. M2005-02106-COA-R3CV, 2006 WL 3952899, at *4 (Tenn. Ct. App. Dec. 29, 2006) ("We must also note that a poem is a work of imagination which allows the minds of both poets and readers to venture into areas that lie beyond the realm of verifiable facts."). However, defendant's suggestion that his songs should be regarded as a "matter of opinion" is, to some extent, quelled by his promotional post to a public Facebook group titled "The Real Deal Track & Field Group" [Doc. 44 ¶ 33]. In this post, defendant claims that his songs "ain't just music" but are rather "statement[s]" that combine "lyrical warfare with real track & field knowledge" [*Id.*]. Defendant goes on to write that, through his songs, he "exposed the cracks, the deception, and the shady recruiting moves happening in the game" [*Id.*]. He also poses the question in his post, "What happens when the truth gets exposed?" [*Id.*].

But the question still remains of whether the actual statements in "Vault Talk" are "capable of conveying a defamatory meaning." *Finney*, 2020 WL 5666698, at *3 (quoting *Revis*, 31 S.W.3d at 253). As with his statements in his demand letter, *see supra*, defendant's lyrics suggest that plaintiff has utilized performance-enhancing drugs to achieve his "legacy" rather through means of hard work [*See* Doc. 44 ¶ 31 ("Claims you built your legacies on blood and sweat / But it[']s P.E.D. dreams")]. Again, such an

[6] Based on plaintiff's pleadings, the Court takes "P.E.D." or "P.E.D.s" to mean performance-enhancing drugs.

accusation could hold plaintiff up to "hatred, contempt, and ridicule." *Am. Addiction Ctrs.*, 515 F. Supp. 3d at 844. Furthermore, the Court concludes that several of defendant's lyrics, while perhaps opinion, are nonetheless "actionable as defamatory" because they can "reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Id.* at 843 (citing *Revis*, 31 S.W.3d at 253). Specifically, stating that plaintiff took "shortcuts" in coaching and abandoned "every rule" can lead to the conclusion that plaintiff is a cheat who flouts the rules of collegiate sports. *Id.* Accordingly, the Court finds defendant's statements in "Vault Talk" to be capable of conveying defamatory meaning.

As to the song "Recruiter to Parents," plaintiff alleges that this song suggests that he is a "untrustworthy and low character coach and warns parents they should not entrust their children" to plaintiff [Doc. 44 ¶ 32]. Characterizing someone as an "untrustworthy and low character" coach is a defamatory statement as it "is sufficiently specific to imply that the [plaintiff] has committed particular acts that society has determined to be improper." *Rhea v. Dollar Tree Stores, Inc.*, No. 04–2254 ML/V, 2005 WL 2600213, at *11 (W.D. Tenn. Oct. 12, 2005) (citations omitted). Furthermore, warning parents not to entrust their children to plaintiff, the Court finds, suggests the "existence of undisclosed defamatory facts justifying the opinion." *Am. Addiction Ctrs.*, 515 F. Supp. 3d at 843 (citation omitted).

Plaintiff also contends that defendant's song "Laws of Attraction," released shortly after "Vault Talk" and "Recruiter to Parent," targets him "with false and disparaging allegations of scandal and fraud, as its lyrics state:

> So why does dirt keep chasing you, Ross?
> Why they always whispering your name?
> Two thousand spans up, caught in a scandal.

> Four years vanished, came back with a handful.
> . . . .
> Only thing you coaching is cover up and fraud.
> If the shoe fits, lace it up.
> . . . .
> It's Johnson 22.
> Your son fumbled the test.
> Tampa Bay slept, now we watchin' a mess
> . . . .
> The whispers ain't whispers.
> They're facts.
> Never change, cover the tracks all you want.
> . . . .
> Parents should know.
> Recruits should too.
> Y'all built on deceit, but I see through the roof.
> . . . .
> But I ain't the type to let history slide.
> This ain't a rumor, this a documented ride.

[Doc. 44 ¶ 34]. Similarly to the lyrics of "Vault Talk," the Court finds that defendant's lyrics here can "reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Am. Addiction Ctrs.*, 515 F. Supp. 3d at 843 (citation omitted). Specifically, defendant states that "dirt" keeps chasing plaintiff, and that the only thing plaintiff is coaching is "cover up and fraud" [*Id.*]. Again, this could lead a reasonable reader to believe that plaintiff is a deceiver who engages in fraudulent practices in his career of coaching track and field at the collegiate level. Additionally, the Court would note that, while the context of the statement is a song, which warrants some latitude of interpretation, the song itself informs its listeners that what is being said is true. Thus, taking into consideration the entire context of song, it cannot easily be dispelled as a "matter of opinion." *See Kersey*, 2006 WL 3952899, at *4.

Next, the Court turns to plaintiff's assertion that defendant's album "To C.A.P." charges plaintiff and his son with using performance-enhancing drugs, claims that plaintiff runs a "dirty program" at Tennessee, and accuses plaintiff of infidelity [Doc. 44 ¶ 36]. Given the similarity of the former two statements to statements already addressed *supra*, the Court finds no need to readdress them here and concludes that they are actionable as defamatory. Thus, the Court turns to the last statement which accuses plaintiff of infidelity. The Court finds that this statement is capable of conveying a defamatory meaning as it can reasonably be understood to assert an actual fact about plaintiff, and said fact holds plaintiff up to contempt and ridicule and lowers his reputation within his community. *See Armstrong*, 546 F. App'x at 441–42; *Revis*, 31 S.W.3d at 253; *Grant*, 2015 WL 5772524, at *9; *see also Memphis Pub. Co.*, 569 S.W.2d at 414, 420 (concluding that the reasonably conveyed meaning of the published statement by the defendant, which falsely implied that the plaintiff was having an affair, was defamatory).

Moving on, the Court looks to plaintiff's comparable claim that defendant "began spreading rumors" that plaintiff "had an affair with one of his female assistant coaches and fathered a daughter with that coach" [Doc. 44 ¶ 38]. Further, plaintiff alleges that defendant posted to social media an "AI[-]generated/doctored photograph of plaintiff's children along with the assistant coach's daughter[,]" but "digitally modified the [daughter's] face to make it appear to be [plaintiff's] face" [*Id.* ¶ 39].[7] Similarly, plaintiff alleges that defendant

[7] It is not clear to the Court whether defendant posted the alleged AI-generated photo with the context of the affair rumor; however, in construing the complaint in the light most favorable to plaintiff, *Bishop*, 520 F.3d at 519, the Court will assume as such.

released a song called "S.L.A.P." which "clearly and unmistakenly insinuates that a paternity test is needed to determine if [plaintiff] fathered the assistant coach's daughter" [*Id.* ¶ 40]. As well, defendant posted a video on social media, "again accus[ing] [plaintiff] of infidelity and impregnating (and then firing) his former assistant coach" at UT [*Id.* ¶ 51]. For the same reasons set forth *supra* regarding defendant's "infidelity" statement, the Court finds that defendant's statements here, as alleged by plaintiff, are capable of defamatory meaning.

Turning to the next set of alleged defamatory statements, plaintiff claims that defendant sent an email to members of UT's athletic department, as well as others, with a "bizarre fictional script ridiculing [plaintiff] as well as links to over *50 songs*" [Doc. 44 ¶¶ 43–44 (emphasis in original)]. Upon review of the email defendant sent, which is attached in full by plaintiff [*id.* at 29–38], the Court cannot conclude that any of the statements made are capable of conveying defamatory meaning. First, the general crux of the email appears to be defendant taunting plaintiff about plaintiff's reaction to the release of defendant's "content," i.e., his "AI spoofs, satire, jokes" as well as his "mixtape[s]" [*Id.* at 33]. Defendant does not repeat any of his aforementioned statements which allege drug use, fraud, dishonesty, infidelity, and extramarital fathering. Nor does defendant include any statements which can be taken as actual facts impugning plaintiff's reputation or implying the existence of undisclosed defamatory statements.

Second, as to the song links defendant attaches to his email, plaintiff claims that these songs "target [him] and are intended to defame, demean, and humiliate him" [*Id.* ¶ 44]. However, plaintiff provides the Court with no detail as to "what specific information about

him was communicated to third parties" in regard to these songs. *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 688 (M.D. Tenn. 2018); *accord Brindley v. Philips Elecs. N. Am. Corp.*, No. 3:11–0352, 2011 WL 2938436, at *5 (M.D. Tenn. July 19, 2011) (dismissing the plaintiff's defamation claim in part because it was unclear from the complaint "what the specific alleged false and defamatory statement was"). "Factual allegations must be enough to raise a right to relief above the speculative level." *Z.J.*, 355 F. Supp. 3d at 688 (citing *Twombly*, 550 U.S. at 555). "While this standard does not require overly detailed factual allegations, it demands more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). Ultimately, without the substance of these songs, the Court cannot determine whether they contain statements capable of conveying any defamatory meaning. Accordingly, for all these reasons, defendant's defamation claim will be dismissed as to this particular allegation [*See* Doc. 44 ¶¶ 43–44].

Next, the Court turns to plaintiff's assertion that defendant posted a fake newscast about the BALCO steroid doping scandal and its purported connection to UT's track and field program under plaintiff [*Id.* ¶ 45]. The video begins with a report announcing that Victor Conte, "the controversial figure behind the BALCO scandal, has died" [*Id.* ¶ 45 n.3]. Then, while showing track and field athletes with UT-branded uniforms on, the reporter states that "fans are asking how good will Tennessee be without Victor Conte?" [*Id.*]. The video ends with a photo of a UT athlete running, and the text "No more secrets. No more shortcuts. The truth always runs?" [*Id.*]. The Court does not find that the statements made in this video are capable of conveying a defamatory meaning in regard to plaintiff specifically. The video does not identify plaintiff by name, nor would a party be able to

readily ascertain plaintiff's identity from the content or context of the statements made. *See Lyons v. State*, 1993 WL 414840, at *3–4 (Tenn. Ct. App. Oct. 20, 1993) (stating that the speakers during the news report in question did not refer to the plaintiff by name or "give any indication as to his identity[,]" and therefore, the plaintiff failed to meet his burden of establishing that the alleged defamatory statements would be understood by another to refer to him); *cf. Malmquist*, 2010 WL 1257800, at *3 (finding the article at issue to identify the plaintiff to a reasonable reader as the article, among other things, referred to the plaintiff's ex-wife and son by name, referred to the plaintiff's marriage to his ex-wife, and identified the plaintiff's profession). At bottom, while the video does readily highlight the UT track and field program, plaintiff is not sufficiently connected to any of the statements made during the video. Therefore, defendant's defamation claim will be dismissed as to this particular allegation [*See* Doc. 44 ¶ 45].

Moving on, the Court looks at the AI-generated videos defendant posted which plaintiff claims attack his character with "blatantly false allegations of wrongdoing" or are generally offensive and demeaning [*Id.* ¶ 46]. These videos include depictions of plaintiff with "Diddy" and Sherrone Moore, a disgraced former university football coach, in suggestive contexts [*Id.* ¶¶ 47–48]. Unsurprisingly given the nascent nature of AI, the Court cannot find, nor do the parties identify, any case law on defamation in relation to AI content, and specifically, videos which are AI-generated. As noted previously, an alleged defamatory statement must be "judged within the context it is made" and "should be read as a person of ordinary intelligence would understand [it] in light of the surrounding circumstances." *Grant*, 2015 WL 5772524, at *10 (internal quotation marks omitted)

(quoting *Revis*, 31 S.W.3d at 253). In attempting to evaluate defamatory statements in accordance with these principles, AI content leads the Court into uncharted territory. Considering this, the Court finds it most appropriate to allow plaintiff's defamation claim as to these AI–generated videos to continue on at this stage of the litigation to allow further record development. *See generally Clark v. EA Ent. Television*, 60 F. Supp. 3d 838, 848 (M.D. Tenn. 2014) (noting that the Sixth Circuit has agreed that there are "difficulties inherent in establishing defamation in cases involving television programs" due to varying segments of audio and video, editing, and tone).

Finally, plaintiff alleges that defendant published two additional songs, titled "3-years-left" and "kinda-nice" which "defame" him [Doc. 44 ¶ 52]. This allegation, the Court finds, is too vague to be actionable. *See Z.J.*, 355 F. Supp. 3d at 688; *accord Brindley*, 2011 WL 2938436, at *5. Therefore, plaintiff's defamation claim will be dismissed as to this specific allegation [*Id.*]

Accordingly, for all the reasons set forth above, most, but not all, of plaintiff's defamation allegations will proceed.

#### 4. Truthfulness Defense

Before concluding its Rule 12(b)(6) analysis regarding plaintiff's defamation claim, the Court finds it appropriate to address defendant's "defense" of truthfulness. Specifically, and as noted above, defendant argues that plaintiff has not "established falsity as a matter of law" [Doc. 28, p. 1]. And in support of this argument, defendant asserts that "publicly available records" reflect the truth of many of his statements or, at the very least, demonstrate that his statements are not verifiably false [*Id.* at 2].

In defamation law, "truth is, almost universally, a defense." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001) (quoting *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 83 (W. Va. 1983)). "It may very well be that none of [d]efendant's statements at issue in this case are false, and that therefore[,] [p]laintiff['s] defamation claim will fail." *Church of God in Christ, Inc.*, 2026 WL 2256336, at *7. "But undertaking to determine the truth of [d]efendant's statements at this stage would contravene the entire legal framework surrounding motions to dismiss." *Id.* Specifically, in deciding a motion to dismiss under Rule 12(b)(6), the court is to "construe the complaint in the light most favorable to the plaintiff, *accept its allegations as true*, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007) (emphasis added); *accord Iqbal*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 U.S. at 570)). Accordingly, any defense by defendant that his statements are true is premature. *See Church of God in Christ, Inc.*, 2026 WL 2256336, at *7.

### C. Causation and Damages

In two separate sections, and apart from his claim that plaintiff fails to assert a claim for defamation, defendant appears to challenge plaintiff's showing of causation and damages [Doc. 17, pp. 4–5, 7]. As to the former, defendant argues that plaintiff "does not plead any causal connection between any alleged statement and a legally cognizable injury" [*Id.* at 7]. And as to the latter, defendant contends that plaintiff fails to plead "actual, personal damages" [*Id.* at 4]. Specifically, defendant asserts that plaintiff has made merely

generalized assertions that his reputation was harmed "or that his professional life was made more difficult" [*Id.*]. Without more, defendant maintains that plaintiff has not plead any kind of measurable, concrete loss required to state a claim [*Id.* at 4–5].

In response, plaintiff appears to focus on defendant's "damages" argument, specifically in relation to his defamation claim [Doc. 27, p. 21]. In particular, plaintiff asserts that, despite defendant's reliance on *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the holding in *Gertz* stands for the exact opposite of what defendant argues [*Id.*]. That is, the Supreme Court in *Gertz* stated that actual injury is not limited to out-of-pocket costs, and in fact, impairment of reputation, personal humiliation, and mental suffering are customary types of actual harm inflicted by defamatory falsehoods [*Id.* (citing *Gertz*, 418 U.S. at 349–350)]. Plaintiff submits that this position has been confirmed by state and federal courts in Tennessee [*Id.* at 22 (citations omitted)]. Accordingly, plaintiff contends that his allegations of reputational harm "easily satisfy the requisite pleading standard for defamation" [*Id.*].

**1. Causation**

In support of his argument that plaintiff has alleged no "causal connection" in this matter, defendant cites to *McWhorter* for the proposition that "Tennessee courts require a clear causal nexus between the challenged statement and an actual injury" [Doc. 17, pp. 4, 7 (citing 132 S.W.3d at 364)]. However, this pincite offered by defendant lends no support

to this assertion.[8] "The Court will **not** consider improperly cited authority." E.D. Tenn. L.R. 7.4 (emphasis in original).

Nonetheless, and to exhaust the point, the Court would note that plaintiff does allege that defendant's conduct "proximately caused significant harm and damage" to him [Doc. 44 ¶ 13]. Considering all this, the Court finds defendant's argument here, and at this stage of the litigation, to be unpersuasive.

**2. Damages**

"Under Tennessee law, damage is an element of a defamation claim." *Blythe v. Forsythe*, No. M2023-01463-COA-R3-CV, 2025 WL 3095415, at *10 (Tenn. Ct. App. Nov. 6, 2025); *accord Poe v. Lowe*, No. 3:24-CV-00368, 2026 WL 1231217, at *8 (M.D. Tenn. May 5, 2026) ("[T]he defamation must have resulted in 'an injury to the person's character and reputation' to be actionable." (quoting *Quality Auto Parts Co.*, 876 S.W.2d at 820)). "Damages from false or inaccurate statements can no[t] . . . be presumed; actual damage must be sustained and proven in all defamation cases." *Kersey*, 2006 WL 3952899, at *6 (citations omitted).

Additionally, "plaintiffs seeking to recover on false light claims must specifically plead and prove damages allegedly suffered from the invasion of privacy." *West*, 53 S.W.3d at 648 (citation omitted). "The plaintiff need not prove special damages or out of pocket

[8] For thoroughness, the Court reviewed the entirety of the *McWhorter* opinion. While there is discussion of whether material evidence existed in the case to support the jury's award of compensatory damages for defamation, *see McWhorter*, 132 S.W.3d at 366–67, the overall opinion contains no such rule or principle as defendant describes. Moreover, the Tennessee Court of Appeals was reviewing the *McWhorter* case on appeal after the matter had gone to trial. 132 S.W.3d at 356. The present case stands in a different posture with a different standard of review.

losses necessarily, as evidence of injury to standing in the community, humiliation, or emotional distress is sufficient." *Id.* (citation omitted).

As argued by plaintiff, defendant's overarching assertion that plaintiff has not plead "actual damages" is inaccurate. "[A]ctual damages typically include out-of-pocket losses, as well as 'impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.'" *Clayton v. Young*, No. 3:22-CV-936, 2026 WL 539471, at *6 n.4 (M.D. Tenn. Feb. 26, 2026) (quoting *McWhorter*, 132 S.W.3d at 366). In the complaint, plaintiff submits that defendant's conduct has caused him "significant injury," specifically to his "personal and professional reputations" [Doc. 44 ¶ 11; *id.* ¶ 62 (alleging that, as a result of defendant's conduct, plaintiff had suffered substantial harm to his reputation)]. Additionally, plaintiff claims that defendant's actions have caused embarrassment and ridicule [*Id.* ¶ 60]. Therefore, what plaintiff has plead is "actual damages" under Tennessee law.

Defendant also contends that plaintiff has only plead damages through "generalized assertions" [Doc. 17, p. 4]. In the complaint, plaintiff describes how defendant's "relentless and malicious" "smear campaign" has caused significant injury to his personal and professional reputations [Doc. 44 ¶¶ 2, 11; *id.* ¶¶ 54, 62, 68]. As to his personal reputation, plaintiff submits that defendant's conduct has held him "up to public attention and ridicule and [has] caused significant embarrassment to himself" as well as his family [*Id.* ¶ 60].

As to his professional reputation, plaintiff submits that defendant's "statements, communications and publications have impugned [his] profession, business, and trade" [*Id.* ¶ 59]. In conjunction with this assertion, the Court considers plaintiff's allegation that

defendant boasted about "likely prevent[ing] [plaintiff] from signing the top high school track recruit in the country to [UT's] 2026 recruiting class" [*Id.* ¶ 52]. Further, the Court notes plaintiff's allegation that defendant's conduct "has been strategically timed with the intent of inflicting maximum harm" [*Id.* ¶ 9]. Specifically, plaintiff claims that defendant's improper actions, such as publicly posting "defamatory and offensive videos regarding [plaintiff] and the [UT] track and field program[,]" spiked on the first day of the early signing period as well as when the college athlete transfer portal opened" [*Id.*]. Taken all together, defendant's actions have been alleged to be linked to a harm to plaintiff's professional reputation as the head coach for UT's track and field program, such that potential athletic recruits have been dissuaded from committing to UT due to plaintiff's impaired professional standing.

Ultimately, while plaintiff certainly could have fleshed out his damages more so in the complaint, the Court finds, at bottom, that plaintiff has done enough to survive under Rule 12(b)(6).

## V. Defendant's Remaining Arguments

Along with the preceding arguments, defendant also submits that (1) plaintiff "lacks standing to assert claims on behalf of minors and adult third parties[;]" (2) plaintiff "fails to state a claim for harassment or cyber-harassment[;]" and (3) plaintiff "lacks standing to assert alleged injury to the University of Tennessee" [Doc. 17, pp. 5–7].

Plaintiff submits that these arguments fail on their face as he has not asserted any claims on behalf of any third parties, including any minors or UT, and he has not asserted any claim for "harassment" or "cyber-harassment" [Doc. 27, p. 23].

Defendant replies, arguing that plaintiff impermissibly relies on alleged harm to third parties when plaintiff must assert his own legally cognizable injury [Doc. 28, p. 7].

**A. Standing to Assert Claims on Behalf of Other Individuals**

As to his first argument, defendant appears to contend, more specifically, that plaintiff has alleged harm on behalf of minors and his adult son "without identifying the real party in interest and the legal basis for representation" [Doc. 17, p. 5]. And "[b]ecause [p]laintiff has not pleaded a basis to assert claims on behalf of minors or adult third parties, all claims premised on such alleged harm must be dismissed" [*Id.*].

While plaintiff makes reference to defendant's statements regarding his adult son [*see* Doc. 44 ¶¶ 26, 36], as well as Devin West [*id.* ¶ 41], and alleges that defendant has caused embarrassment to "his family" [*id.* ¶ 60], plaintiff does not assert any claims on behalf of other individuals in this case. Additionally, plaintiff confirms in his response [Doc. 27, p. 23] that he is not asserting any claims on behalf of any other individual or entity. Thus, with no such claims at issue, defendant's argument is meritless.

**B. Claim for Harassment or Cyber-Harassment**

While defendant sets forth argument that plaintiff has failed to plead the elements of a harassment or cyber-harassment claim, the complaint is, as plaintiff states, devoid of any such cause of action [*See* Doc. 44]. Granted, plaintiff characterizes defendant's conduct often as harassment [*id.* ¶¶ 8–9, 17, 39, 42, 52–53], and plaintiff submits that he is bringing this instant action to end defendant's "cyber-harassment" [*Id.* ¶ 1]. But, as plaintiff states himself, he is bringing no such claim [*See id.* ¶¶ 56–68 (setting forth only claims of defamation and false light invasion of privacy)]. Given the content of the complaint [Doc.

44] and plaintiff's representations [Doc. 27, p. 23], the Court finds defendant's argument here to be meritless.

### C. Standing to Assert Injury as to UT

Finally, defendant contends that any alleged harm to "recruiting, enrollment, donor relations, or institutional standing would constitute an injury to [UT] itself, which is not a party to this action and has asserted no claims" [Doc. 17, p. 6]. Along the same lines, defendant argues that plaintiff must have sustained a "distinct, personal injury" separate from that of UT; otherwise, plaintiff does not have standing [*Id.*].

The Court agrees that, generally, a plaintiff must allege a "personalized injury traceable to the actions" of a defendant, rather than the injury of a third-party. *See Emrit v. Erin Burnett Outfront of Cable News Network (CNN)*, No. 3:25-CV-496, 2026 WL 1148397, at *4 (E.D. Tenn. Apr. 28, 2026), *report and recommendation adopted sub nom*. *Emrit v. Erin Burnett Outfront*, No. 3:25-CV-496, 2026 WL 1967058 (E.D. Tenn. July 7, 2026) ("The alleged defamation of third parties is not an injury that affects [the p]laintiff in a 'personal and individual way.'" (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016))). Here, however, plaintiff does in fact assert his own personalized injury.

As discussed *supra*, plaintiff asserts injury as to his own professional reputation as a track and field coach and to his personal reputation [Doc. 44 ¶¶ 2, 9, 11, 52, 54, 59–60, 62, 68]. While there is reference to defendant's conduct "affecting recruiting" [*see, e.g.*, *id.* ¶ 9], the Court does not find that plaintiff is claiming this to be his personal harm. Rather, plaintiff asserts, or at the very least implies, that an effect in UT track and field recruiting is evidence of his own harm, specifically his professional, reputational harm. Thus, the Court

finds that plaintiff has not "bootstrap[ped] standing from purported institutional harm" [*See* Doc. 17, p. 6].

## VI. Conclusion

For the reasons explained above, defendant's Motion to Dismiss [Doc. 17] is **GRANTED in part** and **DENIED in part**. Specifically, defendant's motion is **DENIED** to the extent defendant moves for dismissal on the basis of lack of personal jurisdiction under Rule 12(b)(2) and improper venue under Rule 12(b)(3). Furthermore, to the extent defendant moves for dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6), such motion is **GRANTED in part** and **DENIED in part** in accordance with the above rulings.[9]

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

[9] As a general matter, the Court **DIRECTS** defendant to E.D. Tenn. L.R. 5.1 for the formatting requirements for documents presented or submitted for filing. Any future filing must meet the requirements of this rule.